# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| TBC SERVICES, LLC individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>vs.<br><br>PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.; CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; and EXXON MOBIL CORPORATION f/k/a PIONEER NATURAL RESOURCES COMPANY,<br><br>         Defendants. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff TBC Services, LLC, individually and on behalf of all others similarly situated ("Classes" or "Class Members"), files this Class Action Complaint ("Complaint") against Permian Resources Corporation (f/k/a Centennial Resource Development, Inc.); Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; and Exxon Mobil Corporation, which as of May 3, 2024, acquired Pioneer Natural Resources Company (collectively "Defendants").

## SUMMARY OF THE ACTION

1.　　This is a class action of end-purchasers, not for resale, of jet fuel against suppliers of shale oil who conspired to limit the supply and fix prices of crude oil, causing an increase in the price of jet fuel from January 1, 2021 until the effects of the conspiracy cease. Plaintiff and

the Class seek treble damages, injunctive relief, and other relief as appropriate based on Defendants' violations of the Sherman Act and state antitrust and consumer protection laws.

2.      Plaintiff brings this antitrust class action alleging that Defendants conspired with each other to coordinate, and ultimately constrain, domestic shale oil production, which has had the purpose and effect of fixing, raising, and maintaining the price of crude oil in and throughout the United States, and worldwide. Defendants have also conspired with the Organization of the Petroleum Exporting Countries ("OPEC")[1], an international consortium of oil producing nations generally considered to act as an oil cartel, to constrain production of crude oil, with the purpose and effect of fixing, raising, and maintaining the price of crude oil in and throughout the United States of America, and worldwide. OPEC believes it can escape U.S. antitrust law because its members are sovereign nations. Defendants, however, are not sovereign nations and are not immune to U.S. antitrust law.

3.      Crude oil is the main input into jet fuel. Jet fuel is a kerosene-based fuel that is derived from crude oil and used to power aircraft with jet, turbine, and turboprop engines—essentially all modern aircraft across commercial, military, and recreational aviation. Like diesel and gasoline, jet fuel is created by refining crude oil.

4.      The price of jet fuel is directly related to the price of crude oil, such that a conspiracy to raise crude oil prices is also a conspiracy to raise the price of jet fuel. The price of crude oil is the main factor involved in establishing the price of jet fuel at the aircraft.[2] Jet fuel

---

[1] And "OPEC+" – an expanded oil cartel that includes OPEC member nations as well as other leading oil nations such as Russia.
[2] *Gas Prices Explained: Five Fast Facts About U.S. Gasoline Prices*, AM. PETROLEUM INST., https://www.api.org/oil-and-natural-gas/energy-primers/gas-prices-explained (last accessed June 13, 2024).

prices are intrinsically linked to the cost of crude oil, with prices typically mirroring the rise and fall of crude oil prices.

5.    Shale oil is a high-quality crude oil found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce jet fuel, gasoline, diesel fuel, and other commercial products sold in the United States. Shale oil is produced through hydraulic fracking or "fracking" – the process of fracturing the rock formations that contain the lawyers of oil, typically by injecting large quantities of fluids.

6.    Crude oil, including shale oil, is sold to refineries which then purchase and combine shale oil produced by Defendants with other shale oil, as well as crude oil extracted from traditional drilling methods. The refineries then refine the crude oil into jet fuel and other petroleum-based products. Crude oil is the primary upstream input in jet fuel. There is no material difference between the oil extracted via fracking and that extracted by drilling, and any given purchase of fuel will likely include a mixture of shale oil and traditionally drilled oil.

**FIGURE #1 – Products Made from a Barrel of Crude Oil in the United States**



Source: U.S. Energy Information Administration

7.    At the refinery, crude oil is separated into usable petroleum products, including gasoline, distillates such as jet fuel, diesel fuel, petrochemical feedstocks, waxes, lubricating oils and asphalt. Jet fuel represents less around 10 percent of U.S. refinery yield, but could be as much as 25 percent or more at a specific refinery depending on its configuration and source of feedstock. Specifically, commercial aviation turbine fuel used in the United States is a kerosene-based product meeting the requirements of the applicable ASTM International specification (e.g., composition, volatility, fluidity, combustion, corrosion, thermal stability, contaminants, additives).

8.    After it is refined, jet fuel is transported to storage terminals, where it is stored and blended, then sold to refuelers who in turn, sell to end-payor jet fuel customers, who are members of the Classes.

**FIGURE #2 – Jet Fuel Supply Chain**



Source: Jet Fuel: From Well to Wing, Airlines for America (January 2018)

9.    Defendants' conspiracy impacted retail diesel prices. The exact effects of the conspiracy are yet to be determined, but the following graph shows the impact generally:

**FIGURE #3 – Jet Fuel Prices (1990-2023)**



Source: US Energy Information Administration, U.S. Gulf Coast Kerosene-Type Jet Fuel Spot Price FOB, USD per gallon.

10.    The price of crude oil and jet fuel steadily increased over the course of 2021 and reached new highs in early 2022.

11.    Plaintiff seeks to represent classes of persons and entities that paid artificially inflated prices for jet fuel. Members of the Class purchase jet fuel for their own use and not for resale.

12.    When major commercial "fracking" of shale formations began around 1998, it focused mainly on natural gas deposits, which were more economically recoverable. In or around 2011, volumes of shale oil, which were previously relatively insubstantial, suddenly drastically

increased. The following chart, taken from a 2015 report written for the European Central Bank,[3]

predicted substantial growth in shale oil volumes – though it substantially underestimated its rise.

Today, shale oil represents nearly 2/3 of the onshore production of all crude oil in the United States.[4]

**FIGURE #4 – Volumes of Shale Oil (1985-2020)**



13.    Domestic independent shale producers ("Independents") are companies that mostly

focus on the exploration, development, and production of domestic shale resources.  Unlike large

vertically   integrated   energy   companies,   such   as   Chevron   and   ExxonMobil   (known   as

---

[3] Cristiana Belu Mănescu and Galo Nuño, *Quantitative Effects of the Shale Oil Revolution*, European Central Bank Working Paper Series No. 1855 (Sep. 2015) at 28, https://www.ecb.europa.eu/pub/pdf/scpwps/ecbwp1855.en.pdf.
[4] *How Much Shale (Tight) Oil is Produced in the United States?*, EIA (Mar. 27, 2023), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6.

"supermajors"), Independents have diverse global operations which focus on exploring, producing, refining, and distributing various energy resources.

14.    Defendants are among the largest Independents and have acted as "swing producers" for the global oil market, meaning they had the ability to rapidly adjust the shale oil production levels in response to changes in market conditions, and therefore push, or "swing," the price of crude oil. Prior to the emergence of the Independents, Saudi Arabia—an OPEC member—had played the role of "swing producer" for the cartel (and the global oil supply generally), and the emergence of the Independents as an economic force challenged Saudi Arabia's power in this respect.

15.    Successful Independents specialize in "racing", meaning they race to: (a) acquire the rights to drill in newly discovered shale plays;[5] (b) drill wells as fast as possible; and (c) secure fracturing and production services that bring wells onto production. Shale wells are usually shorter lived than their conventional counterparts, and relatively more expensive over the life of the project. Thus, the profitability of shale oil projects often depends on timing and volume. Successful companies are those that spin up new projects fast in response to economically viable oil prices. "In a shale play if you stop running, you will fly off the back of the treadmill," one former oil executive told the Financial Times. "Just to stay still, you've got to do a lot of drilling."[6]

_____

[5] A shale "play" refers to a geologic formation containing significant hydrocarbon resources and, by extension, the surface region above the formation where drilling companies extract those resources. For example, the "Bakken Shale play" refers both to an oil-rich section of Late Devonian/Early Mississippian deposited between approximately 360 million years ago, but also to roughly 200,000 square miles of land in North Dakota, Montana, Saskatchewan, and Manitoba from which it can be drilled.

[6] Derek Brower & Myles McCormick, *US Shale Oil: Can a Leaner Industry Ever Lure Back Investors?*, FIN. TIMES, Jan. 31, 2021, https://www.ft.com/content/a8d72d4d-09b1-47fb-bb6c-3c314770f1c1.

16.    For years, the market saw low prices driven by the increasing efficiency and volume of shale oil production. However, in or around January 2021, the United States experienced record-high crude oil prices. Today, crude oil prices are well above the levels at which shale oil production becomes profitable (known as the "breakeven" point in the industry).

17.    Basic economic principles of supply and demand dictate that, as swing producers, Defendants should have responded to high oil prices by "racing" and drilling wells as fast as possible, increasing production to capitalize on the rise in price. Instead, Defendants collectively decided not to increase their U.S. shale oil production, thereby keeping prices high.

18.    When initially faced with the threat of Defendants' shale production, OPEC declared a "price war" on Defendants, seeking to drive them out of the market. Defendants stood their ground in this "price war" and when OPEC couldn't beat Defendants, it joined them. Defendants' agreement to curb U.S. shale oil production is part of their cooperation and collusion with OPEC, which also sought to raise oil prices by managing oil production during this period.

19.    Between 2017 and 2023, Defendants met and communicated regularly with each other, as well as with OPEC. They sought to coordinate their collective oil output in response to market conditions. After their meetings, Defendants' representatives regularly offered public statements confirming these discussions and the exchange of confidential information, though any disclosures of the contents of communications or meetings with OPEC and OPEC+ members have been partial. Over time, these statements became bolder and more brash. Specifically, Defendants confirmed that they discussed with each other and OPEC their production strategies, future investment plans, and price targets. Likewise, when publicly discussing their meetings with Defendants, OPEC officials spoke favorably of the cooperative nature of their developing relationship with Defendants.

20.    Defendants' executives' public statements reinforced their new agreement with OPEC. For one example, Diamondback's CEO Travis Stice described a meeting among shale producers and OPEC as an "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[7] In the lead up to another meeting, a shale CEO boasted: "We now have a seat at the table on pricing."

21.    OPEC officials were even more forthcoming about their collusive meetings with Defendants. For example, in an official OPEC bulletin describing one meeting, OPEC Secretary General Mohammed Sanusi Barkindo said, "[w]e had a very open, frank, and lively conversation[] on [the] current state of the cycle and we also compared note[s] from our experiences during these cycles, how we should proceed going forward." On a panel with Hess Oil CEO John Hess, Secretary General Barkindo was even more explicit: "We have to continue to collaborate. It's one industry. It's a global industry, and I think our colleagues in the U.S. are on the same page with us and we will work together to exchange views."

22.    Between 2017, when these meetings between U.S. shale producers and OPEC began, and early 2020, worldwide oil prices and supply remained relatively low and stable as OPEC and the Defendants negotiated uneasy production cuts. Defendants wanted OPEC to cut production to benefit all producers. OPEC insisted that Defendants also reduce production, rather than "free riding" on OPEC's cuts.

23.    Then, in the beginning of 2020 when the COVID-19 pandemic erupted, jet fuel demand dropped quickly and dramatically, shocking the oil supply chain. In the words of Defendants' own trade association, the American Petroleum Institute, "Supply networks for refined

_____

[7] *Opec sits down to dinner with shale adversaries in Texas*, THE BUSINESS TIMES, Mar. 12, 2019, https://www.businesstimes.com.sg/companies-markets/energy-commodities/opec-sits-down-dinner-shale-adversaries-texas.

products – including gasoline, diesel and jet fuel – appear to be responding properly and flexibly to sudden and sharp declines for transportation fuel stemming from the coronavirus (COVID-19) and global efforts to slow its spread." https://www.api.org/news-policy-and-issues/blog/2020/03/26/fuel-supply-networks-are-responding-properly. In other words, under normal, competitive conditions, the laws of supply and demand operate properly.

24.     By early 2021, as the world began to emerge from the COVID-19 pandemic, crude oil demand began to rebound, and prices increased steadily. The Russian invasion of Ukraine in February 2022 only exacerbated this price increase. These historically high crude oil prices provided ideal market conditions for agile swing producers like Defendants to aggressively increase production. Breakeven prices had never been lower and swing producers were operating in regions with an abundance of profitable opportunities.

25.     Nonetheless, Defendants did not take advantage of these market opportunities. Each Defendant limited their domestic shale production growth and, absent mutual promises among one another to restrain production, no Defendant would fail to respond to these price signals. In the inevitable boom, swing producers would do what they have always done during a boom – make every effort to cash in while the boom lasted. Indeed, this is exactly what small independent shale producers, without enough market share to earn the ire of the cartel, are doing today. Defendants, however, did not. They agreed to remain "disciplined" and limit their shale production volumes.

26.     Defendants' agreement to limit their respective shale production volumes has had, and continues to have, the effect of fixing or stabilizing at an artificially high-level U.S. and global crude oil prices, which in turn fixed or stabilized retail jet fuel prices in the United States at an artificially high level.

27.     Defendants' cartel is a per se unlawful restraint of trade under numerous state antitrust and competition laws. Plaintiff and the Classes suffered substantial harm as a result of the supracompetitive prices they paid for retail jet fuel as a direct and proximate result of the cartel to constrain domestic production of shale oil in the United States. Plaintiff brings this suit to recover that loss.

## PARTIES

28.     Plaintiff TBC Services, LLC ("TBC Services") is a Delaware limited liability company with its principal place of business in Nashville, Tennessee.  TBC Services purchased jet fuel at retail, not for resale, and indirectly, from one or more of the Defendants in at least Alabama, Arizona, California, Colorado, Florida, Mississippi, Nevada, North Carolina, Tennessee, Wisconsin and Utah during the Class Period. TBC Services has paid higher jet fuel prices as a result of the allegations alleged herein.

29.     Defendant Permian Resources Corporation is a publicly traded Delaware corporation headquartered in Midland, Texas. It is a major producer of crude oil from shale oil formations, largely in the Permian Basin in Texas and New Mexico. Permian was formed in 2022 in a transaction between Centennial Resource Development, Inc. ("Centennial") and Colgate Energy Partners III, LLC; during most of the period relevant to this complaint, it was known as Centennial. It sells crude oil into the U.S. domestic market, where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "PR" ticker symbol.

30.     Defendant Chesapeake Energy Corporation ("Chesapeake") is a publicly traded Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. It is a major producer of crude oil from shale oil formations, with operations in Louisiana and Pennsylvania. It sells crude oil into

the U.S. domestic market. where it is refined and disseminated across the country. Its common stock trades on the NASDAQ Stock Market under the "CHK," "CHKEW," "CHKEZ," and "CHKEL" ticker symbols.

31.     Defendant Continental Resources Inc. ("Continental") is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. It is a significant producer of crude oil using shale oil formations, with operations in North Dakota, Montana, Oklahoma, Texas, and Wyoming. Continental sells crude oil into the U.S. domestic market, where it is refined and disseminated across the country. Until November 22, 2022, its common stock traded on the New York Stock Exchange under the "CLR" ticker symbol. Thereafter, the company became privately owned by Harold Hamm, the company's founder, who purchased it through a series of take-private transactions with Omega Acquisition Inc.

32.     Defendant Diamondback Energy, Inc. ("Diamondback") is a publicly traded Delaware Corporation headquartered in Midland, Texas. It is a major producer of crude oil using shale oil formations in Texas. Diamondback sells crude oil into the U.S. domestic market, where it is refined and disseminated across the country. Its common stock trades on the NASDAQ Stock Market under the "FANG" ticker symbol.

33.     Defendant EOG Resources, Inc. ("EOG") is a publicly traded Delaware Corporation headquartered in Houston, Texas. EOG is a major producer of crude oil from oil shale formations with operations covering North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico. It sells crude oil into the U.S. domestic market, where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "EOG" ticker symbol.

34.     Defendant Hess Corporation ("Hess") is a publicly traded Delaware Corporation headquartered in New York, New York. It is a significant producer of crude oil from shale oil formations in North Dakota. It sells crude oil into the U.S. domestic market, where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "HES" ticker symbol.

35.     Defendant Occidental Petroleum Corporation ("Occidental") is a publicly traded Delaware Corporation headquartered in Houston, Texas. It is a major producer of crude oil from shale oil formations in Colorado, Texas, and New Mexico. Occidental sells crude oil into the U.S. domestic market, where it is refined and disseminated across the country. Occidental's common stock and warrants to purchase common stock trade on the New York Stock Exchange under the "OXY" and "OXY WS" ticker symbols, respectively.

36.     Defendant Pioneer Natural Resources Company ("Pioneer") is a publicly traded Delaware Corporation headquartered in Irving, Texas. Pioneer is a significant producer of crude oil from shale oil formations in Texas. It sells crude oil into the U.S. domestic market, where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "PDX" ticker symbol.

## AGENTS AND CO-CONSPIRATORS

37.     Each and every Defendant was a co-conspirator with the other Defendants. Each committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

38.     Unless stated otherwise, where an action by "Defendants" is alleged, it is alleged that each Defendant undertook the alleged action.

39.     "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

40.     Though each Defendant may have subsidiaries and affiliates with separate corporate forms, each Defendant's officers, employees and agents habitually refer to the Defendant and its subsidiaries collectively, not making legal distinctions among related corporate entities. Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

41.     Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions, for whom they are liable.

42.     Co-conspirators known and unknown willingly participated in the alleged conspiracy and acted in furtherance thereof.

**JURISDICTION AND VENUE**

43.     Plaintiff brings this action on behalf of itself and the proposed class pursuant to Section 1 of the Sherman Act (15 U.S.C § 1) and Section 16 of the Clayton Act (15 U.S.C. § 26), as well as the antitrust, fair competition, and consumer protection laws of various states, as alleged herein. The Sherman Act claim is for injunctive relief, costs of suit, and reasonable attorneys' fees; the various state claims seek to recover injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

44.     This Court has subject matter jurisdiction over Plaintiff's claim under Section 16 of the Clayton Act, 15 U.S.C. §26, and under 28 U.S.C. §§1331, 1332(d), 1337(a), and 1367.

45.    This Court has diversity jurisdiction over this action under 28 U.S.C. §1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiff is a resident of a state different from the states of Defendants, all of whom are either incorporated in Delaware or Oklahoma and headquartered in New York, Oklahoma, or Texas.

46.    This Court also has personal jurisdiction over all Defendants, and venue in this District is proper, under the combination of 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d). A substantial part of the events or omissions giving rise to the claim occurred in this District. On information and belief, each Defendant resides, transacts business, is found, or has an agent in this District.

47.    Defendants' activities were within the flow of interstate commerce, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

48.    By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and the geographically dispersed class members. Defendants, directly and through their agents, engaged in activities affecting all states.

49.    Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiff and members of the Classes.

## FACTUAL ALLEGATIONS

### I.    Organization of the Petroleum Exporting Countries ("OPEC")

50.    OPEC is an intergovernmental organization comprised of oil-producing nations who more-or-less explicitly cartelize the production of oil to allow its members to extract oligopolistic prices in the oil market. Its members, each of which is a sovereign nation rather than a private company, purport to benefit from sovereign immunity to the Sherman Act, and historically the United States has not sought to prosecute OPEC or its members under the antitrust laws. OPEC nations control nearly 80% of the world's proven crude oil reserves and close to 40% of the world's oil production. Historically, OPEC exerted market power over global oil prices by coordinating its members' respective production levels. By increasing or decreasing production levels in response to demand and various policy considerations, OPEC effectively controlled prices. Other world oil producers took market prices and made production decisions in the shadow of those prices.

51.    Saudi Arabia has historically acted as OPEC's (and therefore the world's) swing producer due to its ability to rapidly adjust production levels in response to changes in market conditions. Unlike the Defendants, who are able to fill the role due to their relative agility in tapping new reserves, Saudi Arabia maintains a margin of "spare capacity" to make quick adjustments in production. According to the U.S. Energy Information Administration (the "EIA"), "spare capacity" is production that can be brought online within 30 days and sustained for at least 90 days. The IEA estimated that Saudi Arabia's spare capacity in April 2024 was about 3.09 million barrels per day.[8] The entire OPEC cartel currently has spare capacity totaling about 5.33 million barrels per day.[9]

_____

[8] Int'l Energy Agency, *Oil Market Report – April 2024*, https://www.iea.org/reports/oil-market-report-april-2024.
[9] *Id.*

Saudi Arabia is the *de facto* leader of OPEC, as it has the worldwide lowest marginal costs to produce oil, with estimates of production costs even for the highest-cost wells rarely exceeding $10.00 per barrel.

52.     As major shale oil supply from the United States began to hit the global market in the mid-2010s, however, OPEC lost a substantial portion of its control over prices. OPEC could not lower production sufficient to maintain prices without losing substantial market share to shale oil competitors and other global producers. This was a major problem for OPEC members, whose economies largely depend on maintaining a large market share of oil production priced at artificially high oligopoly prices.

53.     To reinforce its cartelized market power, OPEC effectively expanded in December 2016, signing the first of several agreements with ten other oil-producing nations to coordinate production and pricing. Most notable among these new signatories was Russia, which produces almost as much crude oil as Saudi Arabia, albeit at substantially higher cost. This expanded cartel is now known as "OPEC+" and controls nearly 60% of world production today.[10]

54.     The emergence of U.S. shale oil producers had shaken up the dynamics of world oil markets as dramatically as had the formation of OPEC in 1960. OPEC's scramble to exert control over oil prices by bringing new members into the fold—including, eventually, the shale oil producers themselves—was not by choice. A two-year price war with U.S. shale oil producers demonstrated OPEC's reduced dominance in oil markets and drove the cartel to make room at the table for additional producers, which soon included Defendants.

---

[10] U.S. Energy Information Administration, *What is OPEC+ and how is it different from OPEC* (May 9, 2023), https://www.eia.gov/todayinenergy/detail.php?id=56420.

## II.    A "New Oil Order"

55.    The introduction of fracking in the early 2000s radically transformed the oil and gas industry. Although controversial, fracking has been undeniably successful in its goals: within eight years of the first commercial shale operation coming online in Texas in 2002, U.S. shale producers were pumping enough shale oil to reverse a 35-consecutive-year trend of declining U.S. domestic crude oil production. The seven years starting from 2008 represented the fastest increase in domestic crude oil production in U.S. history – the "Shale Revolution."[11]

56.    Despite shale fields having been occasionally exploited for commercial use since the 19th century,[12] exploiting oil in shale formations was difficult. However, innovations in fracking technology in the early 2000s allowed Independents to extract oil economically in formations that had been previously ignored by the industry due to the difficulty and expense of accessing those reserves via traditional drilling techniques. Rapid improvements in three kinds of technologies, in particular, jointly started the fracking boom: horizontal drilling, three-dimensional seismic imaging, and hydraulic fracturing.[13] Each improved the efficiency of drilling for oil in "unconventional" plays.

_____

[11] A similar revolution in natural gas production from shale formations preceded the boom in oil; in 2000, shale gas accounted for 1.6% of U.S. production; by 2010, the figure was 23.1%. *See* Zhongmin Wang and Alan Krupnik, *A Retrospective Review of Shale Gas Development in the United States: What Led to the Boom?* (Resources for the Future Discussion Paper 13-12, Apr. 2013) at 1, https://web.archive.org/web/20150319084508/http://www.rff.org/RFF/documents/RFF-DP-13-12.pdf.

[12] *See* https://www.sciencedirect.com/topics/engineering/shale-oil.

[13] *See* Wang & Krupnick, *supra* n.10, at 10.

57.    Traditional vertical drilling breaches a producing rock layer and collects oil from one point. Horizontal drilling, on the other hand, allows a single well pad[14] to collect oil from a large area, and wells are able to make a horizontal turn along a producing formation.[15] Though each horizontal well was more expensive than its conventional counterpart, the benefits from increased production vastly outstripped the additional cost. New imaging technologies, powered by contemporaneous advances in computer technology, allowed shale companies to target productive formations with much greater accuracy.[16] And dramatic improvements in the relatively old technology of hydraulic fracturing vastly increased well productivity.[17]

58.    By nature, shale fracking is a more granular, small-scale enterprise than the massive conventional projects that had previously dominated the oil and gas industry. Those projects sought out vast reservoirs that would produce enormous quantities over a long time; by the 2000s, such projects generally required enormous capital outlays to reach technically, politically, or infrastructurally complicated sources of oil and gas. These projects often took years of planning and construction to reach out-of-the-way fields at scale. Shale drilling, by contrast, typically involves drilling many smaller and less productive wells very efficiently on a short timeline. Along with the major technological advances that made shale drilling possible, shale drilling companies developed hundreds of smaller innovations from drilling technology to business logistics, each of which shaved important dollars off the capital outlay required to reach shale oil and gas.

_____

[14] A "well pad" is the area that houses the wellheads for horizontally-drilled wells. *See* ETA, *Pad Drilling and Rig Mobility Lead to More Efficient Drilling*, (Sep. 11, 2012) available at https://www.eia.gov/todayinenergy/detail.php?id=7910 (last visited May 15, 2024).
[15] *See* Lynn Helms, *Horizontal Drilling,* N.D. Dept. of Mineral Resources Newsletter (Winter 2008), https://www.dmr.nd.gov/ndgs/documents/newsletter/2008Winter/pdfs/Horizontal.pdf.
[16] *See* Wang & Krupnick, *supra* n.10, at 13.
[17] *Id*. at 12-13

59.    Importantly many of these innovations were developed and perfected during the shale *gas* boom that began in 2000 and had upended natural gas markets by 2005 or 2006. High natural gas prices had led shale companies to target gas-rich formations first; by the time oil prices incentivized U.S. independents to target shale oil in the 2010s, the companies had already honed very fast and efficient drilling methods.

60.    The technological and business efficiency expertise that allowed U.S. shale oil producers to succeed also posed a unique problem for OPEC. Supermajors typically invest in decades-long traditional drilling projects that require significant lead time and infrastructure construction before products can even begin. Shale oil wells, on the other hand, (a) require smaller capital commitments; (b) can be drilled in two to four weeks; (c) can be brought online within months; and (d) allow for production to be comparatively front-loaded. Consequently, production of crude oil from shale wells is more responsive to changing prices and real-time market conditions than traditional drilling methods used by supermajors (and OPEC producers). According to market analysts, U.S. shale oil is "as close to inventory-on-demand as oil ever comes."[18]

61.    These factors gave U.S. Independents unprecedented ability to compete with OPEC and control oil prices. Within months of oil prices reaching economically viable levels, Independents could respond by ramping up production to take advantage of those prices. They could bring supply to market fast enough and in sufficient volume that they could replace supply constrained by OPEC production quotas. U.S. Independents could effectively "free ride" on OPEC's oligopolistic behavior, diminishing the monopoly rents OPEC could extract from their control over supply in the market.

---

[18] Steve LeVine, *Oil Hasn't Bottomed out, so Trade Now at Your Own Peril*, QUARTZ, Feb. 10, 2015, https://qz.com/341884/oil-hasnt-bottomed-out-so-trade-now-at-your-own-peril.

62.     Independents however, unlike OPEC (at least as a practical matter), are subject to the Sherman Act. This meant that while U.S. shale oil production would come to rival the largest OPEC and OPEC+ nations,[19] the industry was not a monolith that traditionally set prices or production levels industry-wide. Rather, as a boon to jet fuel purchasers like Plaintiff and members of the proposed classes, U.S. shale producers were a group of relatively smaller producers who did not hesitate to compete with each other and with OPEC.

63.     In the early-to-mid-2010s, U.S. shale's arrival on the global oil scene thus presented a stark threat to the market control OPEC had maintained for decades. The U.S. shale industry was dubbed "Cowboyistan," a nod to its power as an oil producer and its wild West approach to drilling. A "new oil order" had emerged. The aggressive competition of U.S. shale producers usurped the Saudi swing producer role and saw U.S. domestic production erode OPEC-set cartel price premiums.

III.     **The "OPEC Price War": 2014-2016**

64.     The OPEC sovereign nation-states have Gross Domestic Products ("GDPs) (and, in some cases, currencies) heavily reliant on crude oil prices. These sovereign nation-states and OPEC itself were not about to willingly cede the pricing power OPEC had held over global oil prices for a half-century to U.S. shale producers.

65.     Rather than engage the Independents to effectively join its cartel (as far as can be publicly known), OPEC determined at some point in 2014 that the Independents had captured too

---

[19] Because of the shale oil boom, the United States became the largest oil producer in the world in 2018. As of 2022, the top 5 oil producing countries are the United States (14.7%), Saudia Arabia (13.2%), Russia (12.7%), Canada (5.6%), and Iraq (5.5%). *See* https://www.eia.gov/energyexplained/oil-and-petroleum-products/where-our-oil-comes-from.php.

much OPEC market share and were too much of a drain on its monopoly rents. It set out to leverage its control over the cheapest-to-produce oil in the world to destroy the U.S. shale industry.

66.    Beginning in mid-2014, despite a global oversupply of crude oil, OPEC began to manage its production quotas to push oil prices to a level that would render U.S. shale oil no longer economically viable, while maintaining prices high enough to satisfy the political needs of its members. Thus began more than two years of relatively open global competition, which the industry recognized as the "OPEC Price War." The price of crude oil (and jet fuel) plummeted as shale producers and OPEC nations sold oil into the market at prices not seen since the demand shock of the Great Recession.[20]

_____

[20] *Spot Prices*, https://www.eia.gov/dnav/pet/pet_pri_spt_s1_d.htm.

**FIGURE #5 – Crude Oil Spot Prices (2006-2024)**



67.    The OPEC Price War dragged on for years and OPEC's failure to drive the U.S. shale oil industry out of business was due to two primary factors. First, shale production was a new industry and, as prices dropped, shale producers developed more ways to cut costs and increase productivity, driving breakeven points lower. This allowed Independents to exploit less productive shale plays profitability. Second, the U.S. legal structure (including corporate and bankruptcy law), encourages business formation and risk-taking, making business failure less economically devastating to the individuals involved.

68.    Consequently, by implementing cost-cutting measures and focusing on the most productive shale plays to remain competitive in the lower-price environment, many U.S. shale producers, including Defendants, continued to drill at consistent levels despite the price drop

caused by OPEC's price war. They held on through the long period of low prices, playing chicken with OPEC (whose members, usually depending heavily on oil revenues to support their economies, were also hurting from low prices). They waited, ready to add supply whenever prices improved.

69.    Many U.S. Independents were driven out of business, merging with larger players or going bankrupt in the face of low prices and high debts. But several large players, including Defendants, maintained their position. Rather than killing the U.S. shale oil industry, the OPEC price war consolidated it, causing dozens of smaller Independents to fail and creating a sense of shared mission to hold the line among companies that had often been intense competitors.

## IV.    U.S. Independents Take "A Seat at the Table on Pricing"

70.    Weary after years of low prices that yielded little result,[21] OPEC changed tactics. First, as aforementioned, in December 2016, OPEC struck a deal with 10 non-OPEC oil producing nations to form what is called OPEC+. This brought its global market share to nearly 60% and allowed the cartel to share production cuts with former competitors, especially Russia. Having brought one enormous potential competitor and several smaller ones into the fold, OPEC turned renewed attention toward Cowboyistan.

71.    Unable to beat U.S. shale producers in the free market, OPEC initiated a yearslong campaign to orchestrate a détente in the price war and bring them into the cartel. The negotiations were challenging; U.S. Independents, used to free riding on OPEC cartel prices, thought the cartel

---

[21] Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-bigenough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3eff35afb41797f_story.html (noting that "the companies in [the U.S. shale industry] are ready to add production every time the price starts creeping up" and attributing to Defendant Pioneer CEO Scott Sheffield a promise that if oil prices moved above $60 a barrel, the U.S. Shale industry would respond by ramping up production).

should just slash their own production and raise prices, allowing U.S. producers to reap the benefits. OPEC, of course, wanted to minimize free riding and demanded that U.S. companies forego some opportunities to produce oil at a profit, as the other OPEC members routinely did. The negotiations were complicated further by the need to coordinate U.S. production cuts among a significant group of shale oil producers who were supposed to compete with each other; a major defector among the big Independents would undercut the benefits of cooperation for the others and for OPEC.

72.    **2016.** Independents were open to cartelization, though. They, too, had grown weary of the price war, and they made overtures in startlingly unsubtle ways. As reported by MarketWatch on September 8, 2016, for example, "Shale-oil baron [and Defendant Continental's CEO] Harold Hamm thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later." Hamm, "calling for a freeze of production...said it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries to forge a pact that would put an end to [the] slide in crude oil prices."[22] By maintaining their ground during the price war, Hamm and Defendants had gained leverage over OPEC. Now, Hamm was signaling to OPEC that Continental and the other Defendants were willing to play ball.

73.    **Early 2017.** In early 2017, shortly after Harold Hamm's call for a production freeze, Defendants and members of OPEC began meeting and sharing dinners together.[23] These

---

[22] Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potentialenergy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08
[23] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War*, REUTERS (Mar. 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-usshale-opec-no-rush-resume-price-war-2022-03-10 (OPEC began hosting regular dinners and events in 2017 "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial.").

multilateral meetings took place at oil industry events around the globe—especially at the CERAWeek Conference, an energy-focused event held annually in Houston, Texas.

74.    **March 2017.** The first of these dinners took place at the 2017 CERAWeek Conference,[24] held March 6-10 in Houston. OPEC's General Secretary Mohammed Barkindo "dined with about two dozen[] U.S. shale executives on the sidelines of [the 2017] CERAWeek conference, including Scott Sheffield of [Defendant] Pioneer Natural Resources, Co., John Hess of [Defendant] Hess Corp., Doug Lawler of [Defendant] Chesapeake Energy Corp. and Tim Leach of Concho Resources Inc."[25] OPEC had purportedly never before met with U.S. shale producers, leading to reporters describing the meeting as "unusual."[26] Meetings during the March 2017 CERAWeek Conference "opened a communication channel between the shale companies and OPEC countries."[27] Soon after, Scott Sheffield of Defendant Pioneer said he was seeing a

profound thawing in the relations between [OPEC] and shale producers. He noted that OPEC was reaching out to and spending more time with U.S. independents than he had seen throughout his career."[28]

75.    Bloomberg reported that during the 2017 CERAWeek, "The sides agreed in principle that the market should be better balanced and lower inventories would be beneficial to

---

[24] This is an annual conference that "brings together global leaders to advance new ideas, insight and solutions to the biggest challenges facing the future of energy[.]" https://ceraweek.com/about/index.html.

[25] Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*, BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[26] *Id.*

[27] *Id.*

[28] Sabrina Valle, US oil executive censure puts spotlight on shale-OPEC meetings, REUTERS, (May 2, 2024) https://www.reuters.com/markets/commodities/us-oil-executive-censure-puts-spotlight-shale-opec-meetings-2024-05-02/#:~:text=%22I'm%20seeing%20a%20series,according%20to%20the%20FTC%20complaint.

everyone."[29] Exactly who would bear the costs of those lower inventories remained a matter of contention: shale companies "signaled they weren't ready to give up on the growth they [saw] ahead."[30] OPEC, in turn, affirmed its willingness to cut shale producers into the cartel.

76.    The dinner involved an exchange of competitively sensitive forward-looking information between the shale producers and the cartel:

> "They're trying to understand our business model," Sheffield said of OPEC officials. "I think they're trying to understand more about our ability to produce, what the cost structure is and what's going to happen over the next several years.
>
> In return, shale producers are talking with OPEC to learn about the members' thought process towards the price of oil over the next several years, what supplies the different members have themselves, and whether inventories are falling, he said. "It helps us plan long term," Sheffield said.[31]

77.    Defendant Hess's CEO, John Hess, confirmed that the dinner was no mere listening session: "It was a very good exchange of information and views about oil...It was a good talk," he told Bloomberg.[32]

78.    The boldness of this kind of information exchange is incredible. Information about costs, inventories, capacity, and production is the foundation for cartel negotiations, because it establishes what the competitive terrain would look like in the absence of coordinated production cuts. Discussions of forward-looking production and capacity information are not far off from

---

[29] CERAWeek 2017: Encouragement & engagement, 47 OPEC BULLETIN 2, (Mar./Apr. 2017), https://docplayer.net/55519391-Vienna-austria-save-the-date-june-hofburg-palacevienna-austria.html, at 16 . 36.

[30] Javier Blas, *OPEC Said to Break Bread with Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-breadwith-shale-in-rare-show-of-detente.

[31] David Wethe, *Oil to Hit $40 if OPEC Fails to Expand Cuts, Pioneer Says,* BLOOMBERG, (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-ifopec-doesn-t-extend-cuts.

[32] *See* Blas, *supra* n.26.

agreements on future production levels—effectively setting prices as well. Indeed, after the meeting, "Sheffield said his impression is that OPEC would like to see oil stabilize between $50 and $60, with a preference toward the higher end."[33] Though this meeting was (apparently) only the start of negotiations among some of the hardest bargainers in the world, the stage was set.

79.    While attending CERAWeek 2017, OPEC and the U.S. shale producers "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone...[but] shale producers signaled they weren't ready to give up on the growth they see ahead." They would be ready, though, when the price was right. This opening posture was met with similarly hard-nosed positions from OPEC: Shortly after the meeting, Saudi Arabia's Energy Minister Khalid Al-Falih publicly warned U.S. shale producers that OPEC would not sustain the U.S. producers' "free rides" on OPEC production cuts.[34] At a meeting between Falih and producers, including Defendants Occidental, Pioneer, and EOG, "'One of the advisors said that OPEC would not take the hit for the rise in U.S. shale production,' a U.S. executive who was at the meeting told Reuters." Put another way, OPEC told U.S. shale producers that they would not maintain high oil prices if shale producers kept adding production to take advantage of them; U.S. Independents would have to bear their fair share of production cuts. As with many nascent cartels, negotiations were adversarial but ultimately cooperative.

80.    **October 2017.** Later that year OPEC Secretary General Barkindo told reporters that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a

---

[33] *Id.*

[34] Ron Bousso, *Exclusive - Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale - Sources,* REUTERS (Mar. 9, 2017), https://www.reuters.com/article/us-ceraweek-saudishale/exclusive-saudistell-u-s-oil-opec-wont-extend-cuts-to-offset-shalesourcesidUSKBN16G2TJ.

more responsible manner." [35] According to Barkindo, his takeaway from a CERAWeek Conference sideline meeting with executives of Defendants Hess and Continental Resources was that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[36] He called for U.S. shale producers to take "shared responsibility" for oil prices.[37]

81.    **March 2018**. During the following year's CERAWeek Conference, U.S. shale producers attended another scheduled dinner and Barkindo explained, "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek."[38] He said the dinner was arranged to "further explore the mechanic of achieving our common objective."[39]

82.    During this dinner on March 5, 2018, Secretary General Barkindo gave a speech to the gathered OPEC officials and U.S. shale executives. Tim Dove, then CEO of Defendant Pioneer, later described Barkindo's dinner speech to a reporter as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth." Mark Papa, Defendant Centennial's CEO, characterized the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[40]

_____

[35] Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing,* FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.
[36] *Id.*
[37] *Id.*
[38] Blas & Smith, *supra* n. 23.
[39] *See* Blas & Smith, *supra*.
[40] Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner,* REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energyopec-shale/rpt-%20ceraweek-u-s-shaleandopec-share-steak-in-uneasy-truce-at-houston-dinneridUKL2N1QP05R

83.     OPEC representatives revealed that the dinner facilitated another exchange of forward-looking production expectations. Secretary General Barkindo reported that OPEC and the U.S. shale executives "had a very open, frank and lively conversations on the current state of the cycle and we also compared notes from our experiences during these cycles, how we should proceed going forward. I was very surprised by the high-level of turnout, as well as the interest they [U.S. shale executives] have shown in continuing this energy dialogue."[41] Per Barkindo, OPEC and Defendants had "compared notes on our experiences in this cycle [i.e., the recent price war] which everyone agreed was the most injurious."[42]

84.     Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, told the press: "The key thing is that information is shared about our projections; it really helps everybody...the important thing is to know how much they [U.S. shale] are investing and their projections because usually they have good statistics." [43] By exchanging this information, Mbaga Obiang Lima said, OPEC ministers and shale executives are "avoiding volatility"[44] —or, put differently, stabilizing prices by coordinating production.

85.     Defendants likewise recognized that the dynamics had started to change, sometimes in even more explicit words. Reuters reported that one shale executive, who spoke

_____

[41] *OPEC bulletin Special Edition: OPEC international energy dialogues*, OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf, at 51.

[42] Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-itsrelationship-with-us-shale-producers-to-the-next-level.html.

[43] Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energy-opec-shale/rpt-%20ceraweek-u-s-shale-andopec-share-steak-in-uneasy-truce-at-houston-dinner-idUKL2N1QP05R.

[44] *Id.*

on the condition of anonymity, crowed that U.S. shale oil companies had maneuvered their successful price-war resistance into "a seat at the table on pricing."[45] Even having a "table on pricing" is, of course, a violation of the Sherman Act, which forbids price fixing with competitors unequivocally; OPEC may escape U.S. law by virtue of its sovereign sponsorship and international political clout, but U.S. companies most certainly do not enjoy the same luxury.

86. **May 2018.** Following this second round of negotiations, the Independents signaled more flexibility. One reporter noticed, for example, that Defendant Continental's CEO Harold Hamm "appeared...to be trying to reach a more conciliatory tone with OPEC producers."[46] In May 2018, Hamm "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia," and agreed to speak at an OPEC event, where his appearance was "widely anticipated," not least because of the public shots Hamm had taken at OPEC during the price war.[47] The report concluded by noting that Hamm "has also begun asking fellow shale producers to focus more on profitability and less on profligate production."[48]

87. **June 2018.** With OPEC having come to the U.S. twice to visit shale producers, it was time for the U.S. executives to do some flying. Secretary General Barkindo invited U.S. shale officials to join him at the June 2018 OPEC International Seminar in Vienna.[49] At

---

[45] Alex Lawler & Ernest Scheyder, *OPEC to Meet with U.S. Shale Firms in Houston on Monday: Sources*, REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opecusa/opec-to-meet-with-u-s-shale-firms-in-houston-on-monday-sources-idUSKCN1GB2KP.

[46] Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC meeting*, REUTERS via YAHOO!NEWS (June 18, 2018), https://www.yahoo.com/news/continental resourcesceo-harold-hamm-162200046.html.

[47] *Id.*

[48] *Id.*

[49] Domm, *supra.*

least two Defendant executives, Scott Sheffield (Pioneer) and John Hess (Hess) attended the event, during which Sheffield articulated a negotiating position for U.S. shale oil producers, stating that "OPEC should boost daily output by roughly 1 million barrels over time."[50]

88.     At the event, Sheffield spoke for all Defendants when he said, "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80."[51] Sheffield urged, "OPEC needs to fulfill its duty."[52] A reporter archly noted that "Sheffield will not be part of OPEC's production negotiations on Friday, but his comments are likely to play into the group's discussions...That Sheffield even came to the OPEC event surprised some market observers. U.S. antitrust law prohibits U.S. producers from making any output agreement or from working with OPEC members."[53]

89.     This was an odd position for Sheffield to take, unless it is understood to signal movement by U.S. shale producers in their ongoing negotiations over production quotas. The higher the price of oil, of course, the better for U.S. shale producers, who can (in a competitive market) economically reach more oil, and earn more from existing wells, when prices are high enough to support their marginal resource plays. Additional OPEC production does neither Pioneer nor the shale industry any favors, effectively lowering the price of oil and diverting market share to OPEC and away from shale. Absent an unusual generosity of spirit from the shale oil industry, the only reason to articulate such a position

_____

[50] Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS (June 20, 2018), https://www.reuters.com/article/oil-opec-pioneer-natl-rscidINKBN1JG2OB.
[51] Scheyder & Bousso, *supra* n. 38.
[52] *Id*.
[53] *Id*.

on the doorstep of an OPEC production meeting would be to narrow the gap in the Independents' and OPEC's negotiating positions.

90.     Critically, at the 2018 OPEC summit, Defendants publicly admitted, maybe for the first time, to actively participating, rather than merely listening, during their meetings with OPEC. Sheffield admitted to conversing with the OPEC panel about Defendants' and OPEC's volumes, and the effects on global oil prices: "My message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference. If they don't we are going to see $100 oil or higher."[54]

91.     The exchange between Sheffield and OPEC appears to have been extremely specific: Two days before OPEC's June 22, 2018, production negotiation, Sheffield predicted to Bloomberg the exact amount of OPEC's production change.[55]

92.     **January 2019.** In January 2019 at the Davos World Economic Forum, CEO John Hess (Hess), CEO Vicki Hollub (Occidental), and OPEC's Secretary General Barkindo sat together on a panel with Dan Yergin, Vice Chairman of IHS Markit, which performs market analyses on behalf of OPEC member nations.

---

[54] Bloomberg Daybreak: Americas, *Pioneer Chairman Sees an OPEC Increase of Up to 600,000 B/D*, BLOOMBERG (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

[55] *Compare id.* (Sheffield: "The soft number will be around 5-600,000 [bpd], they might announce 1 million...and that will phase in over the next few months.") *with* Rania El Gamal, et al., *OPEC agrees modest hike in oil supply after Saudi and Iran compromise*, REUTERS (June 22, 2018), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil supplyafter-saudi-and-iran-compromise-idUSKBN1JI0OG/ ("Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply. Iraq said the real increase would be around 770,000 bpd[.]").

93.    Both Hess and Hollub "said that growth of U.S. shale oil output would slow" in the near future,[56] and Barkindo, in turn, expressed a desire "to talk more regularly to U.S. producers to understand their industry better even if they could not participate in any OPEC-led production cuts."[57] In other words, OPEC wanted to coordinate mutual production cuts while winking at U.S. law.

94.    Hess praised and affirmed these comments, saying OPEC "plays a very important role in stabilising the market and those efforts need to be recognised."[58] Barkindo emphasized that OPEC and Defendants, "have to continue to collaborate. It is one industry. It is a global industry, and I think our colleagues in the US are on the same page with us and we will work together to exchange views."[59]

95.    **March 2019.** For the third CERAWeek in a row, in March 2019, U.S. shale executives and OPEC met with each other at the event. Bloomberg reported that "[t]he event has become an informal communication channel between the cartel and fast-growing shale producers."[60] In the leadup to these meetings, Secretary General Barkindo explained, "[w]e initiated a valuable dialogue with the U.S. shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue because we broke barriers...It is essential we continue the conversation with U.S. shale industry."[61]

---

[56] Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow*, REUTERS (Jan. 23, 2019), https://www.reuters.com/article/uk-davos-meeting-opec-usa-idUKKCN1PH1TG
[57] *Id.*
[58] Tom DiChristopher, *Trump blasted OPEC this past year. Hess CEO says the oil producer group deserves praise*, CNBC (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trumpblastedopec-hess-ceo-says-the-group-deserves-praise.html.
[59] *Id.*
[60] Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third Year*, BLOOMBERG (Mar. 11, 2019), https://www.bnnbloomberg.ca/opec-to-break-bread-withshale-competitors-for-third-year-1.1227226.
[61] *Id.* (sic).

96.     Reporting on a Monday night dinner attended by CEOs John Hess, Vicki Hollub, Mark Papa, and Travis Stice, from Defendants Hess, Occidental, Centennial, and Diamondback, respectively, Barkindo described a "friendly conversation on current industry issues and the immediate prospects and challenges for all." Diamondback CEO Stice also told reporters that OPEC and Defendants had "a very good session," consisting of "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."

97.     In January, OPEC and its allies began new production reductions. All agreed to cut supply by 1.2 million bpd throughout the following six months. [62] Following announcements of the cuts, Reuters reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing." At CERAWeek 2019, Barkindo made clear that OPEC and allies would continue supply adjustments through 2019.

## V.     Defendants' Negotiations Culminate in Shale Oil Production Cuts

98.     Yet Defendants' developing cooperative relationship with OPEC, still in its infancy, remained fragile. Though communications and exchanges had ramped up, it is unclear when, exactly, Defendants began coordinating their output in conjunction with OPEC. Through the end of 2018, it at least appeared to the outside world that Defendants were not ready to slow their growth: Whether this is because OPEC had agreed to allow the U.S. some room for rapid expansion, or the U.S. companies were taking a hard line is not

---

[62] Alex Lawler, *OPEC posts first 2019 oil-output rise despite Saudi cuts*, REUTERS (Aug. 30, 2019), https://www.reuters.com/article/us-oil-opec-survey-idUSKCN1VK1YD.

yet known. What is clear is that knowledgeable industry commentators expected the U.S.'s rapid expansion to continue, but it did not.

**FIGURE #6 – Change in Crude-Oil Production – U.S. Shale Oil v. OPEC (2014-2019)**



99.    Analysts predicted that 2019 would commence "[t]he second wave of the U.S. Shale revolution." This would have been "concerning for OPEC" because, rather than the calculated supply control that OPEC sought, "U.S. oil output is expected to grow by 1.4 million barrels a day this year, to average 12.4 million barrels a day."[63]

---

[63] Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, THE WALL STREET J. (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-foroil-price-supremacy-11555588826.

100.    Analysts' predictions of the second wave never came to fruition. In 2020, COVID-19 upset plans in every industry, but especially oil, where lockdowns drove demand to unheard-of lows. A mix of lockdown chaos and futures market technicalities drove the price of oil below zero on April 20, 2020, and it remained under $40 per barrel from early March to mid-June. OPEC made emergency cuts to production to stabilize prices; the shale oil industry went through another round of mergers and bankruptcies, further consolidating market share in the hands of large players.

101.    If Defendants and OPEC had not reached full agreement before COVID, they soon did after COVID. Following months of market turmoil, in July 2020, OPEC's Secretary General indicated that OPEC could inflate and sustain high crude prices, and would do so if Defendants cooperated in turn:

> We were able to reach out to the U.S. independents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. Everybody has a role to play. We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry.[64]

102.    On November 28, 2020, EOG Resources' CEO Bill Thomas voiced the industry's promise not to increase production in response to OPEC's raising oil prices: "In the future, certainly we believe OPEC will be the swing producer—really, totally in control of oil prices...We

---

[64] *OPEC Secretary General: No objective to drive US shale out of business*, OIL & GAS JOURNAL (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretarygeneral-no-objective-to-drive-us-shale-out-of-business.

don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[65]

103.    In early 2021, as pre-pandemic life began to resume, jet fuel, gasoline, and diesel fuel demand surged, and with them, so did crude oil prices, reaching nearly $70 a barrel in March 2021. To push prices up further, OPEC and OPEC+ countries purposefully and collectively withheld production in the face of this rising demand.

104.    Defendants held up their end of the bargain. Abruptly, and in near unison, they slowed down their own new production. Suddenly, Defendants' CEOs began making a lot of public statements about the need for the industry to exercise "discipline" in its production decisions. Throughout 2021, Defendants signaled to each other and to OPEC that they would ignore market price signals and abdicate their role as swing producers:

  a) **February 2021.** Chesapeake CEO Doug Lawler announced that U.S. shale
     producers were entering a "new era" of shale production that "requires a
     different mindset" of "more discipline and responsibility."[66]

  b) **March 2021.** On the same day OPEC publicized its supply restrictions,
     Occidental CEO Vicki Hollub said that even in this "healthier supply and
     demand environment" and despite "a V-shaped" post-pandemic recovery,
     U.S. oil production would not resume to pre-pandemic heights, Defendants

_____

[65] Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-8/thepandemic-has-broken-shale-and-left-oil-markets-in-opec-hands.
[66] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-reboundeven-crude-prices-rise-2021-02-22/.

and other U.S. shale producers were now "committed to value growth, rather than production growth."[67]

c) **April 2021.** Sheffield explicitly stated that his company and other U.S. producers would not meet rising prices: "OPEC and Russia were upset that we grew too much," said Sheffield. "If we ever start growing again too much, we're going to have another price war." He stated he was "totally against" an EIA forecast predicting substantial production growth and that "producers now know the stakes and will stick to their mantra of capital discipline."[68]

d) **June 2021.** In an interview with Reuters, Sheffield said he was "confident the producers will not respond" to the high crude oil prices by increasing production, because they were focused on "shareholder returns."[69] Reuters further reported that "[i]n the United States, closely held companies have contributed substantially to rig additions this year, but Sheffield said those smaller firms should not drive up volumes enough to ruffle OPEC+ producers."[70]

---

[67] Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, Says Occidental CEO*, CNBC (Mar. 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-productionwont-return-to-pre-pandemic-levels-occidental-ceo.html#:~:text=Occidental%20CEO%20Vicki%20Hollub%20said,Evolve%20conversation%20with%20Brian%20Sullivan.
[68] Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE (Apr. 14. 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.
[69] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-outputeven-oil-price-jumps-2021-06-28.
[70] *Id.*

e) **August 2021.** During an August 5, 2021, earnings call, EOG President and CEO Bill Thomas, picked up the "new era" terminology first put forward by Chesapeake's Lawler, explicitly connecting U.S. producers' collective discipline with shared prosperity from monopoly rents. He predicted: "I think OPEC+ is solid. I think the U.S. will remain disciplined. And so, I think the industry is in for a long run of really good results."[71]

f) **October 2021.** On October 3, 2021, Sheffield said U.S. producers were not willing to increase supply to curb soaring crude oil prices that were "under OPEC control," [72] reflecting Defendants' production restraint agreement. Sheffield reaffirmed Pioneer's commitment to the agreement, promising to cap any Pioneer output increase at 5% per year regardless of the price of crude oil, explaining "everybody's going to be disciplined, regardless whether it's $75 Brent, $80 Brent, or $100 Brent."[73]

105.    Given Defendants' breakeven prices of approximately $40/barrel, their newly discovered restraint was a surprise to some oil industry observers. Reporters and industry analysts found it remarkable, if not bizarre:

---

[71] EOG Resources (EOG), *Q2 2021 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/.

[72] Derek Brower & David Sheppard, *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says*, FIN. TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45cea13a-7d8419426b05.

[73] Brower & Sheppard, *supra.* "Brent" refers to a price benchmark used by the oil industry and is used here as an apparent shorthand for oil price.

a) **January 2021.** Reuters reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles."[74]

b) **June 2021.** A second Reuters journalist observed that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel."[75] However, Defendants' output restraints had "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors."[76]

c) **Early 2022.** On an earnings call for Chesapeake, Bank of America Managing Director and Head of U.S. Oil and Gas confronted Chesapeake's CEO over their plans to slow production, admonishing that it would be "the easiest way to destroy value" for the company in the long term.[77]

106. Yet OPEC was not surprised. In early 2021, OPEC accurately predicted a significant annual drop in U.S. shale production.[78] OPEC also signaled that the price war was

---

[74] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (Jan. 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-outputeven-oil-price-jumps-2021-06-28.

[75] John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

[76] *Id.*

[77] Chesapeake Energy Corporation (CHK), *CEO Nick Dell'Osso on Q4 2021 Results -Earnings Call Transcript*, SEEKING ALPHA (Feb. 24, 2022), https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nickdellosso-on-q4-2021-results-earnings-call.

[78] EIA, Petroleum and Other Liquids: *U.S. Field Production of Crude Oil*, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrfpus1&f=a (last accessed June 7, 2024).

over. Secretary General Barkindo reported that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that Independents and OPEC "have a shared responsibility in this regard."[79]

## VI.    Defendants' Coordination with OPEC Reaches New Heights in 2022-2023

107.    In 2022, reacting to Russia's invasion of Ukraine, crude oil prices shot up. Distinct from the drastic drop in demand precipitated by the pandemic, this was a supply-side shock that caused a decrease in the quantity of oil available in the U.S. market, both from increased strain on supply chains, and more importantly, the separation of Russia's oil production from the world market.

108.    By mid-2022, the price of oil surpassed $120 a barrel—its highest price since the overheated pre-crash economy of 2008. Aiming to maintain these high prices as the initial price shock from Russia's invasion wore off, OPEC withheld further production, and made production cuts in October 2022 of two million barrels per day. OPEC announced these cuts as crude prices began to return to normalcy from their near-record highs, and indicated they were intended to "stabilize the recent fall in global energy prices."[80]

109.    Despite record prices in 2022, and consistently high prices in 2023, Defendants continued to act against their economic self-interest and withheld production: a) In February of 2022, against the backdrop of Russia's imminent invasion of Ukraine, Sheffield once more made remarks alluding to the existence of an agreement between and among Defendants: "In regard to

_____

[79] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-reboundeven-crude-prices-rise-2021-02-22/.

[80] Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, THE WASH. POST (Oct. 5, 2022), https://www.washingtonpost.com/business/2022/10/05/opec-plus-oil-cut-russia-saudi-arabia/.

the industry, it's been interesting watching some of the announcements so far, the public[ly listed] [I]ndependents are staying in line" and "I'm confident they will continue to stay in line."[81] Shockingly, he disclaimed any sensitivity to the price of oil even if it nearly doubled, sending untold shale acreage into unheard of profitability. "Whether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans," he told one reporter.[82]

110.    Later in February, other Defendants signaled their alignment. During an earnings call, Continental CEO William Berry confirmed, "[w]e project generating flat to 5% annual production growth over the next five years."[83]

111.    On February 22, 2022, Diamondback CEO Travis Stice asserted, "we have no reason to put growth before returns...we will continue to be disciplined."[84]

112.    On February 24, 2022, Bloomberg reported that "EOG Resources Inc. plans to restrain oil growth despite surging prices, falling into line with most other major U.S. independent shale producers...like Pioneer Natural Resources and Continental Resources[, who] are also limiting increases to less than 5% this year."[85]

113.    In March 2022, Occidental CEO Vicki Hollub touted its "huge inventory of high-quality investments" but bizarrely explained her company's failure to act on those opportunities to

---

[81] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html#:~:text=The%20largest%20U.S.%20shale%20producers,shale%20firms %20said%20this%20week.

[82] *Id.*

[83] *Id.*

[84] Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

[85] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eogholdsback-oil-production-growth-in-line-with-shale-peers.

expand production by alternately blaming the pandemic and explaining the decision as a "focus[] on returning capital to shareholders."[86]

114.    On an August 2022 earnings call, EOG said that even though the economic conditions were ripe for a production increase, the company intended to limit its 2023 production growth to "low single digits" and was "committed to remaining disciplined."[87] In 2022, EOG increased production by a mere 4% and indicated it planned for the same increase in 2023.[88]

115.    In January 2023, Sheffield stated that the "aggressive growth era of US shale is over." According to Sheffield, Pioneer and the other Defendants were "no longer a swing producer."[89]

116.    Knowing Independents' breakeven prices were continuing to fall, oil industry observers expressed their continued shock at Defendants' production restraint and refusal to compete for market share:

    a)    An article in the Washington Post posited that the price increases following Russia's invasion of Ukraine were a "clear signal to raise [shale] production; we're talking Bat-Signal clarity here."[90]

---

[86] Pippa Stevens, *Oil Producers in a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC (Mar. 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-diresituation-and-unable-to-ramp-output-says-oxy-ceo.html.

[87] EOG Resources (EOG), *Q2 2022 Earnings Call Tr.*, THE MOTLEY FOOL (Aug. 5, 2022), https://www.fool.com/earnings/call-transcripts/2022/08/05/eog-resources-eog-q2-2022-earnings-call-transcript/.

[88] Liz Hampton, *U.S. Shale Producer EOG Sticks to 4% Annual Output Growth*, REUTERS (Aug. 5, 2022), https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-lowsingle-digit-oil-output-2022-08-05/

[89] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[90] Liam Denning, *Shale Companies Say They Can't Drill More. Even When There's a War?* BLOOMBERG (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-0228/shalecompanies-say-they-can-t-drill-more-even-when-there-s-a-war

b)  A February 2022 Bloomberg article questioned why Defendant EOG wouldn't "take advantage of higher prices by pumping more crude from its shale fields." The article noted that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[91]

c)  In March 2022, a CNBC anchor observed: "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[92]

d)  On April 3, 2023, following additional reductions by OPEC, Bloomberg reported that the U.S. shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices, and would not "rescue" U.S. consumers from high gas prices, despite being "flush with cash after record profits."[93] As one industry expert explained, "OPEC and shale are much more on the same team now, with supply discipline on both sides" which "really puts a floor under the price of oil long term."[94]

117.    Over the course of 2022 and 2023, Defendants and OPEC officials continued to meet and communicate with each other.

---

[91] Crowley, *supra*.

[92] Stevens, *supra*.

[93] Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, Bloomberg (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-04-03/opec-surprise-cut-won-t-be-filled-by-us-shale-oil?in_source=embedded-checkout-banner.

[94] *Id.*

118.    During the March 2022 CERAWeek Conference, held in Houston, Texas, Defendants met with OPEC officials once more. At some point during this week, Defendants and OPEC "gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Barkindo with a bottle labeled 'Genuine Barnett Shale' – from the oilfield that launched the shale revolution. Barkindo proudly displayed the memento as he left the meeting, which included executives from Hess Corp...and Chesapeake Energy."[95] As observed by Reuters, Defendants and OPEC had "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production."[96] Chesapeake CEO Domenic Dell'Osso agreed that "[w]ere shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem."[97]

119.    In March 2023, "about two dozen [U.S. shale executives] including [Defendants' executives:] Sheffield [of Pioneer],...Nick Dell'Osso of Chesapeake Energy, Travis Stice of Diamondback Energy, Vicki Hollub of Occidental Petroleum, and John Hess of Hess Corporation met with OPEC Secretary General[-elect] Haitham Al Ghais[98] for a private dinner in a downtown Houston steakhouse" to reaffirm their mutual commitment to withholding production, "[d]espite recent record profits." At the dinner, "[t]he shale executives pressed Al Ghais on how much spare

---

[95] Hampton, *supra*.
[96] *Id.*
[97] *Id.*
[98] In January 2022, OPEC declined to grant Mohammad Sanusi Barkindo a third term as Secretary General and chose Haitham Al-Ghais, a veteran oil official from Kuwait, as his successor. Barkindo was scheduled to leave his position at the end of July 2022, but on July 5, he passed away. According to the New York Times, "[t]here is no indication that the change of leadership will influence how much oil OPEC produces." Stanley Reed, *Mohammad Barkindo, OPEC's top official, dies*, THE N.Y. TIMES (July 6, 2022), https://www.nytimes.com/2022/07/06/business/opec-barkindo.html#:~:text=Barkindo%20was%20scheduled%20to%20leave,how%20much%20oil%20OPEC%20produces.

production capacity OPEC could deploy, and offered their own assessment of how much extra output the US could deliver this year – a range between 400,000 and 600,000 b/d, according to one person at the dinner." While speaking to the reporter, Sheffield stood fast in his support of OPEC, "I think the people that are in charge now are three countries – and they'll be in charge the next 25 years. Saudi first, UAE second, Kuwait third." Sheffield appears not to have commented on his industry's collective proposal of forward-looking production estimates to OPEC, or what they received in return.

120.    At the start of 2023, Defendants alleviated any doubt that they were coordinating with OPEC, making financial decisions they could not reasonably have made without advance knowledge of OPEC production cuts.

121.    On January 5, 2023, Defendant Pioneer's CEO Sheffield claimed that "OPEC ministers are frustrated over the recent price fall," before predicting that upcoming production was "going to change...If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut.. .[W]e'll see what happens in the next 90 days."[99]

122.    Then, 87 days later, OPEC "shocked traders around the world" by declaring a "surprise"[100] production cut as OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."[101]

123.    On March 27, 2023, in between Sheffield's prediction and OPEC's shocking announcement, it was brought to the public's attention that some Defendants, including at least

---

[99] Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shaleexecutive-correctly-called-opec-s-surprise-output-cut?sref=NqTCpwwa#xj4y7vzkg.

[100] *Id.*
[101] Reuters, *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN (Apr. 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oilproduction-of-about-115-mbpd.

Pioneer (Sheffield's company) and EOG, had pulled back the hedge positions they had previously established to protect against downward oil price movements. As a result, Defendants were "suddenly vulnerable" and left exposed to exorbitant economic risk if oil prices declined.[102]

124.    Defendant Pioneer's CEO Sheffield defended its incredibly risky actions, stating "we're not going to hedge," and he remained "optimistic that we'll see $100 a barrel before the end of the year."[103]

125.    On April 2, 2023, within a week of the news concerning Defendants' exposed positions coming to the public forefront, OPEC announced their "surprise" production reduction, cutting a consequential quantity of 1.15 million barrels of oil production per day. There is simply no explanation for Defendants' failure to hedge other than their advanced knowledge of OPEC's plan to cut production.

126.    In April 2023, an energy analyst explained the resulting impact from Defendants' output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up. That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects. Today, shale is as responsive as in the past. But there's a difference. The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share. Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.[104]

---

[102] Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN.TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.
[103] *Id.*
[104] Blas, *supra*.

127.    Defendants had the ability to increase production and gain market share but opted not to.

**TABLE #1 – Defendants' U.S. Oil Production Growth Rates In Pre- and Post-Class Period**

| Defendant | 2017-2019 U.S. Oil Production Growth Rate (Comparison Period) | 2021-2023 U.S. Oil Production Growth Rate (Class Period) |
|---|---|---|
| Centennial/Permian[134] | 123% | 56% |
| Chesapeake | 31% | -63% |
| Continental | 43% | 42% |
| Diamondback | 220% | 19% |
| EOG | 36% | 6% |
| Hess | 25% | -6% |
| Occidental | 89% | 8% |
| Pioneer | 34% | 3% |
| Defendants' Production Weighted Average | 63% | 14% |
| Average Crude Oil Price per Barrel | $55.01 | $78.42 |
| Average U.S. Consumer Gasoline Price | $2.67 | $3.61 |

128.    Defendants' agreement to restrain production worked. Defendants have enjoyed massive revenue increases, which they have retained rather than reinvested into new production.

**VII.    Absent Collusion, Defendants' "Restraint" is Economically Irrational**

129.    Defendants employed a variety of terms and phrases, including being "disciplined," or focusing on "value growth," or "staying in line," or operating for "shareholder returns," as code for their mutual agreement to coordinate and restrain domestic shale oil production. Moreover, Defendants' repeated public touting of their production discipline

revealed that they each had additional production capacity that they simply chose to leave untouched.

130.    In a competitive market for one of the most important commodities on earth – crude oil – when prices are higher than a firm's marginal costs, the firm increases its supply to the point where the market price equals the marginal cost of producing an additional unit of supply (accounting for an economic profit). Real-world considerations complicate this model somewhat, but it remains among the foundational principles of microeconomics because those complications *don't matter that much* in the real world. With oil prices far above each Defendant's "break-even" point, each Defendant had enormous incentives to pursue additional production. In a competitive market, if you are not drilling that oil, someone else is. Thus, no single Defendant would restrain production unless they *knew* their competitors would also restrain their production.

131.    The only economically rational reason any Defendant would choose this path is if they each knew the others would *also* decline to increase production, and that enough of the crude oil market would exercise similar restraint that it would not significantly affect the Defendants' market share. Individually, no U.S. shale oil producer had market power sufficient to constrain overall U.S. shale oil outputs significantly—never mind world outputs. Together, however, they had substantial power in the U.S. market—especially with respect to the swing production that mattered most to global prices. Together, the Defendants could substantially constrain the portion of U.S. oil production most important to the global price of oil; and as a result, they could exercise their power to negotiate cartel supply restrictions with OPEC, insuring against competition from other major swing producers.

132.    Indeed, the supermajors and many smaller Independents did respond to these individual incentives, though practical limitations on their ability to respond quickly limited their

effect. Supermajors have historically refrained from substantial investments in fracking wells, viewing them as a smaller-scale enterprise difficult to integrate into their very large-scale institutions. Yet in 2021 and 2022, directly responding to U.S. shale producers' "underinvesting as an industry,"[105] the supermajors began investing in shale at unprecedented rates.

      a) Responding to record high crude oil prices, ExxonMobil planned to boost its 2022 production level in the Permian Basin by 25%.

      b) Likewise, Chevron planned a 10% increase in the same region at the same time.

      c) In May 2023, ExxonMobil Chief Executive Darren Woods stated that by using new technologies Exxon aimed to double the volume of oil produced from its U.S. shale holdings over a five-year timeframe.

133.    Smaller, non-public shale companies likewise took advantage of the favorable economic conditions and drilled some of that oil, too. In 2022, "[s]maller, privately held firms...raised production in response to higher prices and are going full steam ahead."[106] Benefitting from the production gap left by Defendants, these smaller private producers "lead output gains during the highest [crude oil] prices in seven years."[107] As one example, according to

---

[105] Clifford Krauss, *What Exxon & Chevron are Doing with Those Big Profits*, THE N.Y. TIMES (Feb. 1, 2023), https://www.nytimes.com/2023/02/01/business/energyenvironment/exxon-chevron-oil-gas-profit.html.

[106] Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising as Smaller Producers Lead the Way*, Reuters (Mar. 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keeprising-smaller-producers-lead-way-2022-03-02/.

[107] *Id.*

Reuters, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig...and is eying a threefold increase" from 2021 in 2022 production.[108]

134.    Small shale oil producers, however, are limited in how *fast* they can add supply because they lack Defendants' economies of scale. They have less capital, less access to limiting resources like drilling rigs, and are less able to scale up hiring and management to operate multiple drilling projects in parallel.

135.    The fact that the small producers, and particularly the Supermajors, moved in with production increases in shale oil—even where this constituted a major departure from previous practices—while the Independents did not, demonstrates the economic irrationality of Defendants' output restrictions in the absence of an agreement with OPEC and one another.

## VIII.    FTC Consent Order Bans Sheffield from Exxon's Board of Directors Due to Collusion Threat

136.    On May 2, 2024, the Federal Trade Commission ("FTC") allowed Defendant Exxon Mobil's merger acquisition of Defendant Pioneer for $64.5 billion (the "Proposed Acquisition") to proceed, provided that Exxon agreed that Pioneer's former CEO Scott Sheffield would not serve as a director on Exxon Mobil's board and would not act as an advisor to Exxon Mobil.[109]

137.    The FTC's decision and order (the "Consent Order") notes that the FTC investigated the Proposed Acquisition and publicly released a draft complaint (the "Complaint"), providing a summary of the FTC's findings. If the Complaint was finalized and filed, the FTC

---

[108] *Id.*

[109] *FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal*, May 2, 2024, https://www.ftc.gov/news-events/news/press-releases/2024/05/ftc-order-bans-former-pioneer-ceo-exxon-board-seat-exxon-pioneer-deal (attaching Consent Order and Complaint)

indicated that it would charge Exxon Mobil with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.[110]

138.   The FTC indicated that it uncovered "voluminous evidence" that Sheffield made both public and private statements in a campaign to "organize anticompetitive coordinated output reductions between and among U.S. crude oil producers." By banning Sheffield from Exxon Mobil's board of directors, the FTC sought to prevent Sheffield from engaging in collusive activity that would potentially raise crude oil prices.[111]

139.   The FTC concluded that "by giving Mr. Sheffield a larger platform from which to pursue his anticompetitive schemes—as well as decision-making input and access to competitively sensitive information of Exxon—the Proposed Acquisition violates Section 7 of the Clayton Act because it would meaningfully increase the likelihood of coordination and thereby harm competition, in the market for development, production, and sale of crude oil. Increases in crude oil prices are passed on to Americans through higher gasoline, diesel, heating oil, and jet fuel prices."[112]

## IX.   The FTC Reveals Sheffield's Campaign to Collude with OPEC to Raise Oil Prices

140.   The FTC's investigation revealed Sheffield's statements about keeping U.S. oil output artificially low and detailed Sheffield's coordination with OPEC and OPEC+ to reduce the output of oil and gas, resulting in higher prices for consumers and inflated profits for Pioneer.[113]

---

[110] *Id.*

[111] *Id.* (Complaint at 1 & 4).

[112] *Id.*

[113] *Id.* at 5.

141.    The FTC indicated that as far back as March 2017, Sheffield began attending meetings with OPEC, including a private dinner with the General Secretary of OPEC at the time, Mohammed Barkindo.[114]

142.    The communications with OPEC officials continued, and in 2020, during the early days of the COVID pandemic, the conversations focused on Sheffield limiting Permian Basin oil production since oil prices were falling globally.[115]

143.    Around the same time, the FTC found that Sheffield lobbied the Railroad Commission of Texas to impose output restrictions on oil production in the Permian Basin which would have reduced output and increased prices above market levels. Sheffield stated: "[i]f Texas leads the way, maybe we can get OPEC to cut production...I was using the tactics of OPEC+ to get a bigger OPEC+ done."[116]

144.    Throughout the relevant period, the FTC found that Sheffield stayed in regular contact with representatives of OPEC, including the exchange of information on oil pricing and output and the facilitation of communications between OPEC and representatives of his competitors in the Permian Basin.[117]

145.    Further, the FTC indicated that Sheffield told competitors to "stay[] in line" and be "disciplined" about capacity growth, stating: (1) in 2021, that "[a]ll the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies;" and (2) in

---

[114] *Id.* at 6.

[115] *Id.*

[116] *Id.* at 5-6.

[117] *Id.* at 7.

2022, that "the public independents are staying in line...I'm confident they will continue to stay in line."[118]

146.    In 2023, the FTC indicated that Sheffield admitted that previous price competition had lowered prices for consumers but hurt shale investors and that the shale operators had to stay in-line because shale operators "produced too much oil and competed with OPEC...We actually lowered the price by $20 to $30 per barrel over the past 10 years to the detriment of losing our entire investor base."[119]

## DEFENDANTS COLLECTIVELY AND WITH OPEC EXERCISE SUBSTANTIAL MARKET POWER OVER OIL PRICES

147.    That Defendants collectively had sufficient power to dramatically affect global oil prices is unmistakable. The below chart shows quarterly changes in world oil supply and demand from 2005 to 2023.

---

[118] *Id.* at 7.
[119] *Id.* at 7.

**FIGURE #7 – Quarterly Changes in Global Oil Supply and Demand (2005-2023)**



148.    Much of the world's oil consumption is essentially steady, with substantial changes in demand over time driven by long-term trends. For example, despite variances from quarter to quarter, the above graph shows an overall steady long term upward trend in oil consumption since 2005, driven largely by growth in developing countries and softened somewhat by developed nations' efforts to decarbonize their economies.

149.    Predictable long-term demand trends drive predictable long-term trends in supply, with long-term increasing demand sparking major capital investments in large conventional and unconventional oil projects, usually helmed by supermajors. Sponsors of these large projects invest an enormous amount of up-front capital in developing them on the strength of their long- term predictions of demand, betting that the projects will produce oil at

low marginal costs for many years, which oil can be sold into the market at a consistent profit, gradually delivering strong returns on up-front capital.

150.    Because they take so long to plan and bring on-line, these large projects do not affect global prices much, at least on medium-term time horizons, though they do affect the long-term global mix of suppliers. Supermajors effectively sell their product at consistent and predictable levels to a consistent and predictable base of demand.

151.    On shorter time horizons, supply and demand for oil vary substantially, but within a very narrow band of the total oil market. These variations are represented by the smaller peaks and troughs along the overall upward trend in the chart above. The largest variances in demand during the period shown above are the unprecedented COVID-19 drops in Q1 and Q2 2020, with demand plummeting 7.48 and 6.89 million barrels per day ("Mmbd"), respectively, from pre-Covid demand of about 102 Mmbd. At the lowest ebb of this crisis, in other words, world oil demand declined by a little less than 15%. The next quarter, demand rebounded by 5.63 Mmbd. Excepting the COVID crisis, the largest change in demand in the last 18 years was a decline of 1.95 Mmbd in the second quarter of 2005. On average over this period, even including the volatility induced by the pandemic, global oil demand varied only a bit more than 1 Mmbd from quarter to quarter—an average of about 1.2% throughout the timeline.

152.    World crude oil production varies within a similarly narrow band. The largest quarterly increase in global production was in Q2 2020, jumping 8.38 Mmbd. Average supply changes from quarter to quarter were only 0.82 Mmbd.

153.    These relatively small changes in supply and demand (and the financial markets' expectations about them) drive short- and medium-term variation in the global price of oil. For example, in the second half of 2014, the beginning of OPEC's price war with U.S. Independents,

global oil supply increased over Q2 levels by only 3.03 Mmbd. Over the same period, global demand increased by 1.53 Mmbd. The resulting 1.5 Mmbd change in the balance of supply and demand—about 2% of total production—sent crude oil prices plummeting from $105.79/bbl in June 2014 to $59.29 in December. In other words, a two percent net change in oil supply caused a forty-seven percent drop in the price.

154.    As of 2022, Defendants collectively produced in excess of 1 Mmbd of crude oil, at artificially constrained conspiracy levels. This represents a small portion of the global oil supply, but its agile supply is poised at the margin of the oil market's balance of supply and demand and therefore takes on critical significance. Defendants control even more potential production that could be brought into production within months. As a result, Defendants' share of short-run productive capacity—the capacity that most affects short-term variation in oil prices—is much higher, particularly when the productive capacity controlled by the OPEC+ cartel is excluded. By withholding their production as a group (and especially by coordinating production levels with OPEC+), Defendants' market power is more than enough to substantially influence global crude prices.

155.    When Defendants' production and productive capacity are considered in conjunction with OPEC and OPEC+, the cartel formed by these entities collectively controls approximately 60% of total world oil production. More importantly, they control nearly all world oil production that can be quickly brought to market in response to short-run price variations.

## PLUS FACTORS FURTHER SUPPORT THE EXISTENCE OF THE ALLEGED CONSPIRACY

156.    OPEC's and Defendants' statements quoted above amply evince explicit coordination of production cuts among Defendants and OPEC. Lest this evidence be ignored,

however, Defendants' parallel conduct in jointly restricting shale oil production is well supported by "plus factor" indicators that support a plausible and reasonable inference of collusion over potential non-collusive explanations.

157.    The oil industry is highly vulnerable to collusion over production levels. Indeed, it should be undisputed that it supports a thriving cartel that effectively controls global prices. It is the quintessential commodity, where product is interchangeable, facilitating price-fixing negotiations among would-be competitors.

158.    Defendants had and continue to have many opportunities for collusion. As described above, Defendants did in fact meet collectively with OPEC during trade association gatherings, including annually at the CERAWeek Conference in Houston, TX, to discuss their internal cooperation and the overall cooperation with OPEC by all Defendants to maintain that surplus capacity. Public reports of these meetings from participants (who have incentives not to reveal the full extent of their collusion) confirmed that the meetings were explicitly intended to facilitate cooperation between Defendants and OPEC. Additionally, the communications were not limited to public statements but included "private communications" between at least Defendant Pioneer's CEO and OPEC.[120]

159.    The price-moving portion of the oil market—the short-run productive capacity to supply production quickly in response to price signals—is highly concentrated, and most of it is explicitly cartelized in OPEC and OPEC+. Outside of this cartel, Defendants control a

---

[120] FTC, *FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal*, (May 2, 2024) available at https://www.ftc.gov/news-events/news/press-releases/2024/05/ftc-order-bans-former-pioneer-ceo-exxon-board-seat-exxon-pioneer-deal (last visited May 15, 2024).

significant portion of the remaining productive capacity. More broadly, though the global oil market is relatively diverse, more than 60% of the market is explicitly cartelized.

160.    The market conditions for crude oil sold in the U.S. are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, is a daily-use commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly inelastic demand. Inelastic demand allows producer cartels to extract monopoly rents from customers who have few options to avoid price increases.

161.    As explained in detail above, Defendants faced strong individual incentives to increase their production during the Class Period, and their individual decisions not to increase production are economically rational only if made in a context of mutual commitments among themselves to constrain production.

162.    As illustrated above, Defendants shared a high level of interfirm communications, both in private and through publicly reported statements about competitively sensitive information such as forward-looking production plans.

## ANTITRUST INJURY

### A.    Defendants' Agreement to Constrain Shale Oil Production Has Influenced the Price of Crude Oil Throughout the Class Period

163.    As noted above, Defendants' control over a substantial share of short-run productive capacity allows it substantial influence over crude oil prices. Many observers have attributed shifts in the price of oil to U.S. oil shale production.

a) A 2019 Forbes article reports that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because, since 2008, "U.S. oil production increased by 8.5 million bpd – equal to 73.2% of the global increase in production."[121]

b) In a 2017 article titled "The oil market in the age of shale oil," economists declared that, since 2014, U.S. shale oil has impacted the price of oil by amplifying the worldwide crude oil supply and influencing OPEC production policies.[122]

c) In October 2019, the Executive Office of the U.S. President's Council of Economic Advisors asserted that the U.S. shale revolution has "reduced the global price of oil by 10 percent" since 2007.[123]

d) In 2020, economists from the Federal Reserve Bank of Dallas concluded that oil prices would have risen by 36% in 2018 without the shale oil revolution.

e) In 2023, an article published in the International Journal of Energy Economics and Policy states that, in the past, "[t]he increase in US crude oil production, driven by shale oil...significantly increased oil supply, directly affecting the price of crude oil[.]"

164. Defendants admit that they have this influence, yet are choosing not to use it. A New York Times article published on March 2, 2022, reported that, "[e]xecutives of several

_____

[121] Robert Rapier, *The U.S. Accounted For 98% Of Global Oil Production Growth in 2018*, FORBES, June 23, 2019.
[122] Irma Alonso Álvarez and Virginia Di Nino, *The oil market in the age of shale oil*, ECB Economic Bulletin, August 2017, at 73.
[123] The Council of Economic Advisors, *The Value of U.S. Energy Innovation and Policies Supporting the Shale Revolution*, October 2019, at 3.

companies, including [Defendant] Pioneer Natural Resources...and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices[.]"[124]

165.    From no later than 2021, Defendants have collectively coordinated their production decisions, resulting in production growth rates lower than would be seen in a competitive market, despite high oil prices and an active global demand.

166.    Despite production increases from Supermajors and smaller private producers, Defendants' production restraint has significantly impacted total U.S. shale production. In 2022, U.S. shale oil production increased by a mere 500,000 barrels, which was 50% short of market analysts' general yearly predictions.

167.    This result led to a significant difference between the oil supply that actually came to market and the oil supply that would have come to market absent Defendants' conspiracy. This gap led to a rise in crude oil prices over the prices that would have prevailed in the "but-for" world, leading invariably to higher prices at the aircraft for class members and others.

**B.    Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Retail Jet Fuel Purchased by Plaintiff and the Classes**

168.    Jet fuel purchasers in the U.S., like Plaintiff and the proposed class members, purchase jet fuel at airports.

169.    The primary driver of jet fuel prices is crude oil.  There is a direct relationship between the price of crude oil and the retail price of jet fuel.  The vast majority of airline fuel used by U.S. airlines is jet fuel, which is a kerosene-based fuel derived from petroleum. Being a

---

[124] Stanley Reed, As oil soars, OPEC and its allies decline to offer relief, NEW YORK TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html.

petroleum product, the price of jet fuel is greatly affected by the global price of crude oil. For example, the three most common benchmarks of global oil prices – the Brent, the West Texas Intermediate, and the OPEC (Reference) Basket – all exhibit similar fluctuations in the price of airline fuel in the same period.   https://www.statista.com/statistics/197689/us-airline-fuel-cost-since-2004.

170.    The chart below shows New York jet fuel prices against Brent crude oil prices back to January 2019. Jet's prevailing price before the COVID-19 pandemic was around $20/Bbl over Brent, but the changes in jet and crude were *almost identical* on a daily or weekly basis.

**FIGURE #8 – New York Jet Fuel Prices Against Brent Crude Oil Prices (2019-2021)**



Source: https://aegis-hedging.com/insights/Jet-and-Diesel-Consumers-Could-Prices-Be-Much-Higher-in-2022

171.    Costs of refining, taxes, and distribution and marketing do not fluctuate often, whereas the price of crude oil is actively traded in financial markets and moves constantly, often experiencing large swings. Between March and August 2022, for example, the WTI spot crude oil price ranged from less than $50 per barrel to more than $120. On a *single day* in the Class Period—March 9, 2022—the price of oil dropped nearly $15 per barrel, more than 11%.

172.    When taking account of crude oil's movement through the supply chain from Defendants to end-users, it is far from surprising that crude oil largely drives the pricing of jet fuel. Defendants and other crude oil producers sell crude oil to refineries, who then use chemical separation and reaction processes to convert crude oil into jet fuel and other products (*e.g.*, gasoline, home heating oil, diesel fuel, and manufacturing feedstocks). The refineries then transport the fuel to bulk terminal storage facilities.

173.    Because crude oil is the primary raw material used to refine jet fuel sold in the United States, Defendants' conspiracy had a direct effect on Plaintiff and members of the Classes who were forced to purchase jet fuel at artificially inflated levels.  Retailers of jet fuel purchase it at prices directly linked to the price that was paid by refineries for crude oil, including crude oil sold to those refineries by Defendants. Jet fuel retailers set the price of retail jet fuel above the wholesale price they pay, thereby passing on to Plaintiff and the class any increase in the wholesale price.

174.    As such, the price of crude oil has a direct effect on the price of derivative products, such as jet fuel and gasoline.[125] Because crude oil is the primary raw material used to refine jet

---

[125] Ian Thomas, *U.S. won't reach a new record in oil production 'ever again,' says Pioneer Natural Resources CEO,* CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-newrecord-oil-production-ever-again-pioneer-ceo.html. (In his 2023 State of the Union, President Biden said that U.S. gasoline prices were too high because oil producers invested "too

fuel sold in the United States, and because changes in crude oil prices drove changes in jet fuel

prices paid by Plaintiff and members of the Class throughout the relevant period, Defendants'

conspiracy had a direct effect on Plaintiff and class members who were forced to purchase jet fuel

at artificially inflated levels. Indeed, end-user purchasers, who are class members here, bear much

of the brunt of these artificially inflated jet fuel prices.

175.    Further, while retail fuel prices are often quick to absorb price increases, they tend

to react distinctly slower when oil prices decrease.[126] This asymmetrical pass-through dynamic,

coined "rockets and feathers," reveals the immediate yet enduring impact of Defendants'

artificially inflated transportation fuel prices on the end users.[127] According to the U.S. Energy

Information Administration ("EIA"), even when the price of jet fuel declined from record highs

---

little" of their "record profits" to ramp up domestic production and "used those record profits to
buy back their own stock, rewarding their CEOs.").

[126] FTC Bureau of Economics, *Gasoline Price Changes and the Petroleum Industry: An Update,* (2011) at 35, https://www.ftc.gov/sites/default/files/documents/reports/federal-trade commissionbureau-economics-gasoline-price-changes-and-petroleum-industry-update/federal-trade-commissionbureau- economics-gasoline-price-changes-and-petroleum-industry.pdf. *See* Bumpass et al., *Retail and wholesale gasoline price adjustments in response to oil price changes,* Energy Economics (2015) at 54, https://doi.org/10.1016/j.eneco.2015.08.030 (finding, from study using monthly U.S. city average pricing data, that "in the long run, a one-dollar increase in the price of oil per gallon increases the retail gasoline price by $1.05 per gallon[.]"); Najmeh Kamyabi and Benaissa Chidmi, *Asymmetric Price Transmission between Crude Oil and the US Gasoline Market,* Journal of Risk and Financial Management (2023) at 6, https://www.mdpi.com/1911-8074/16/7/326 (finding, on the state level, comparable pass-through rates of crude oil prices to regular gasoline prices). *See also* Kangni Kpodar and Chadi Abdallah, "Dynamic Fuel Price Pass-Through: Evidence from a New Global Retail Fuel Price Database," IMF Working Paper, No. 16/254 (2016) at 25, https://www.imf.org/external/pubs/ft/wp/2016/wp16254.pdf, (finding, from study of 162 countries, that on average, a one cent increase in crude oil prices per liter translates to a 1.2 cent increase in retail gasoline prices per liter, meaning a 120% pass-through rate, six months after the shock.).

[127] *See* Sun, *et al.*, *Asymmetric pass-through of oil prices to gasoline prices with interval time series modelling,* ENERGY ECONOMICS, Vol. 78 (2018) (collecting studies that indicate the asymmetric price pass-through relationship between crude oil prices and gasoline prices), https://doi.org/10.1016/j.eneco.2018.10.027

at New York Harbor, it remained at elevated levels. "This Week in Petroleum," May 4, 2022, p.

1, U.S. Energy Information Administration, Petroleum and other Liquids.

## CLASS ACTION ALLEGATIONS

176.    Plaintiff brings this action on behalf of itself, and as a class action under the Federal

Rules of Civil Procedure, Rule 23(a), (b)(1) and (b)(2) seeking injunctive relief on behalf of the

following class defined as:

> All persons and entities who, during the Class Period, purchased jet
> fuel, not for resale, in the United States between January 1, 2021, and
> until Defendants' unlawful conduct and anticompetitive effects cease
> to persist.

177.    Plaintiff also brings this action on behalf of itself, and as a class action under the

Federal Rules of Civil Procedure, Rule 23(a) and (b)(3) seeking damages as well as equitable

relief, on behalf of the following class (the "State Law Class") defined as:

> All persons and entities who, during the Class Period, purchased jet fuel,
> not for resale, in Alabama, Arizona, California, Colorado, Connecticut, the
> District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine,
> Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana,
> Nebraska, Nevada, New Hampshire, New Mexico, New York, North
> Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee,
> Utah, Vermont, or Wisconsin between January 1, 2021, and until
> Defendants' unlawful conduct and anticompetitive effects cease to persist.

178.    Specifically excluded from the Classes are the Defendants, their parent companies,

subsidiaries and affiliates, co-conspirators, federal government entities and instrumentalities of

the federal government, states and their subdivisions, agencies and instrumentalities, and the

Court.

179.    While Plaintiff does not know the exact number of the members of the Classes,

Plaintiff believes there are (at least) hundreds of members in the Classes. Joinder is therefore

impracticable.

180.    Common questions of law and fact exist as to all members of the Classes. Such questions of law and fact common to the Classes include, but are not limited to:

a)  Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of crude oil and/or jet fuel in the United States;

b)  the duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

c)  whether such combination or conspiracy violated the antitrust and consumer protection laws of various states;

d)  whether Defendants' conduct involved concealment or misrepresentation of the nature of Defendants' affiliation among themselves and with OPEC;

e)  whether Defendants' violation of state consumer protection laws was material;

f)  whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and other members of the Classes;

g)  whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on jet fuel;

h)  the effect of Defendants' alleged conspiracy on the prices of retail jet fuel sold in the United States during the Class Period;

i)  the appropriate Class-wide measure of damages; and

j)  the nature of appropriate injunctive relief to restore competition in the U.S. market for jet fuel.

181.    Plaintiff's claims are typical of the claims of the Class Members, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all Class Members are

similarly affected by the Defendants' wrongful conduct, namely that Plaintiff and all Class Members paid artificially inflated prices for jet fuel sold in the United States, resulting from price-fixing in the crude oil market by Defendants.

182.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

183.    The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

184.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

185.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## CLAIMS FOR RELIEF

### COUNT 1
### Violation of § 1 of the Sherman Act (15 U.S.C. § 1)

186.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

187.   From at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for crude oil and retail jet fuel in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

188.   In formulating and executing the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, raising, and stabilizing of the price of crude oil and retail jet fuel.

189.   The combination and conspiracy alleged herein has had the following effects, among others:

a)   Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

b)   Prices for crude oil sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c)   Those who purchased jet fuel indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition, and paid artificially high prices for jet fuel.

190.    Plaintiff and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for jet fuel purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

191.    Plaintiff and members of the classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## I.    Violations of State Antitrust Laws

192.    During the Class Period, Plaintiff and Class Members purchased jet fuel. But for Defendants' conduct set forth herein, the price of jet fuel would have been lower, in an amount to be determined at trial.

193.    During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust laws.

194.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiff and Class Members; exchange of competitively sensitive information between and among Defendants; and participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

195.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct,

Plaintiff and members of the Class were deprived of free and open competition and paid more to purchase jet fuel than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

196.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiff and Class Members.

197.    Accordingly, Plaintiff and Class Members seek actual damages, treble damages, statutory damages where applicable, injunctive relief where applicable, costs and reasonable attorneys' fees.

198.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of state antitrust statutes.

199.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and Class Members.

200.    In the Counts that follow, "Class" refers to the State Law Class unless otherwise specified.

## COUNT 2
## ALABAMA
### (On Behalf of Class Members that Purchased Jet Fuel in Alabama)

201.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

202.    During the Class Period, Plaintiff and Members of the Class purchased jet fuel indirectly and not for resale from one or more of the Defendants in Alabama.

203.    Due to Defendants' unlawful conduct, (1) competition for crude oil and jet fuel was restrained, suppressed, and eliminated within Alabama; (2) jet fuel prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-560 *et seq.* Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiff and the members of the Class seek all forms of relief available under ALA. CODE §65-60 *et seq.*

### COUNT 3
### ARIZONA
### (On Behalf of Class Members that Purchased Jet Fuel in Arizona)

204.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

205.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout Arizona; (2) prices of jet fuel in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

206.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq.*

**COUNT 4**
**CALIFORNIA**
**(On Behalf of Class Members that Purchased Jet Fuel in California)**

207.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

208.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout California; (2) jet fuel prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

209.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce. Each defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of oil. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of and jet fuel. As a result of Defendants' violation of CAL. BUS. & PROF. CODE §16720, Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

**COUNT 5**
**COLORADO**
**(On Behalf of Class Members that Purchased Jet Fuel in Colorado)**

210.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

211.    Plaintiff and Members of the Class purchased jet fuel not for resale in Colorado during the Class Period.

212.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout Colorado; (2) jet fuel prices in the State of Colorado were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

213.    During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

214.    Defendants have violated COLO. REV. STAT. §6-4-101 *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under violated COLO. REV. STAT. §6-4- 101, *et seq.*

**COUNT 6**
**CONNECTICUT**
**(On Behalf of Class Members that Purchased Jet Fuel in Connecticut)**

215.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

216.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CONN. GEN. STAT. §35-24 *et seq.*

217.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout

Connecticut, and (2) jet fuel prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition.

218.    During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

219.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of CONN. GEN. STAT. §35-24 et seq.

220.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under CONN. GEN. STAT. §35-24 *et seq.*

**COUNT 7**
**DISTRICT OF COLUMBIA**
**(On Behalf of Class Members that Purchased Jet Fuel in the District of Columbia)**

221.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

222.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the District of Columbia; (2) jet fuel prices in the District of Columbia were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

223.    During the Class Period, Defendants' illegal conduct substantially affected the District of Columbia commerce and consumers.

224.    Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq.*

225.     Accordingly, Plaintiff and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq.*

## COUNT 8
### FLORIDA
### (On Behalf of Class Members that Purchased Jet Fuel in Florida)

226.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

227.     Through their actions and actions of co-conspirators, crude oil and jet fuel prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class.

228.     Throughout the Class Period, competition in the crude oil and jet fuel market was restrained, suppressed, and eliminated throughout Florida. Plaintiff and members of the Class, including those who purchased jet fuel in the State of Florida, paid supra-competitive, artificially inflated prices for jet fuel.

229.     During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

230.     Defendants have violated the FLA. STAT. §542.15 *et seq.*, through their anticompetitive actions.

231.     Accordingly, Plaintiff and members of the Class seek all forms of relief available under FLA. STAT. §542.15 *et seq.*

## COUNT 9
### HAWAII
### (On Behalf of Class Members that Purchased Jet Fuel in Hawaii)

232.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

233.   Defendants have violated HAW. REV. STAT. ANN. §480-1 *et seq.*, through their actions. *See* HAW. REV. STAT. §§480-4, 480-13.

234.   Through Defendants' actions and the actions of their co-conspirators, jet fuel prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and the Class.

235.   Throughout the Class Period, price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Hawaii.

236.   Members of the Class, including those who resided in the State of Hawaii and purchased jet fuel in Hawaii, paid supra-competitive, artificially inflated prices for their jet fuel.

237.   During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii.

238.   Accordingly, Plaintiff and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq.*

## COUNT 10
## ILLINOIS
### (On Behalf of Class Members that Purchased Jet Fuel in Illinois)

239.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

240.   Defendants' combinations or conspiracies had the following effects: (1) price competition in the crude oil and jet fuel market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) jet fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois.

241.   During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

242.    Defendants have entered into agreements in restraint of trade in violation of 740 ILL. COMP. STAT. 10/1 *et seq.*

243.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under 740 ILL. COMP. STAT. 10/1 *et seq.*

## COUNT 11
## IOWA
**(On Behalf of Class Members that Purchased Jet Fuel in Iowa)**

244.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245.    Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq.*

246.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) jet fuel prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa.

247.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

248.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq.*

249.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq.*

**COUNT 12**
**KANSAS**
**(On Behalf of Class Members that Purchased Jet Fuel in Kansas)**

250.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq.*

252.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Kansas; (2) jet fuel prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

253.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

254.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq.*

**COUNT 13**
**MAINE**
**(On Behalf of Class Members that Purchased Jet Fuel in Maine)**

255.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

256.    During the Class Period, Plaintiff and members of the Class indirectly purchased jet fuel in the State of Maine.

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101.

258.     Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil jet fuel was restrained, suppressed, and eliminated throughout the State of Maine; and (2) jet fuel prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels.

259.     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

260.     Accordingly, Plaintiff and members of the Class seek all relief available under ME. STAT. TIT. 10, §1104.

## COUNT 14
## MARYLAND
## (On Behalf of Class Members that Purchased Jet Fuel in Maryland)

261.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.     Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Maryland for crude oil and jet fuel by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized jet fuel prices in the State of Maryland at artificially high levels.

263.     During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

264.     Defendants violated the MD. CODE ANN., COM. LAW §11-201 *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of Maryland.

265.     Accordingly, Plaintiff and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq.*

**COUNT 15**
**MASSACHUSETTS**
**(On Behalf of Class Members that Purchased Jet Fuel in Massachusetts)**

266.    Plaintiff incorporates each allegation in the preceding paragraphs of this Complaint.

267.    By reason of the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS Ch. 93A § 2, *et seq.*

268.    Plaintiff and members of the Class purchased retail jet fuel within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

269.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

270.    Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

271.    Plaintiff and members of the Class purchased goods, namely retail jet fuel, primarily for personal, family, or household purposes.

272.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Class have been injured in their business or property and are threatened with further injury.

273.    By reason of the foregoing, Plaintiff and members of the Class are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Massachusetts General Laws Ch. 93A § 9.

274.    The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply as to Defendants because, upon information and belief, Defendants have not identified a place of business or assets within Massachusetts.

## COUNT 16
## MICHIGAN
**(On Behalf of Class Members that Purchased Jet Fuel in Michigan)**

275.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

276.    Defendants 'combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) jet fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

277.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771 *et seq.*

278.    Accordingly, Plaintiff and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq.*

## COUNT 17
## MINNESOTA
**(On Behalf of Class Members that Purchased Jet Fuel in Minnesota)**

279.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

280.    Through their actions and actions of co-conspirators jet fuel prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiff and the Class.

281.    Throughout the Class Period, price competition in the market for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Minnesota.

282.    Plaintiff and members of the Class, including those who resided in the State of Minnesota and purchased jet fuel there, paid supra-competitive, artificially inflated prices for jet fuel.

283.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

284.    Defendants have violated the MINN. STAT. §325D.49 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiff and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq.*

## COUNT 18
## MISSISSIPPI
### (On Behalf of Class Members that Purchased Jet Fuel in Mississippi)

285.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

286.    During the Class Period, Plaintiff and Members of the Class purchased jet fuel indirectly and not for resale from one or more of the Defendants in Mississippi.

287.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq. See* MISS. CODE ANN. §75-57-63.

288.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) jet fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi.

289.    During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce.

290.    Accordingly, Plaintiff and members of the Class seek all relief available under MISS. CODE ANN. §75-21-1 *et seq.*, and MISS. CODE ANN. §75-57-63.

**COUNT 19**
**NEBRASKA**
**(On Behalf of Class Members that Purchased Jet Fuel in Nebraska)**

291.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

292.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) jet fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska.

293.    During the Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

294.    Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq.*

295.    Accordingly, Plaintiff and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq.*

**COUNT 20**
**NEVADA**
**(On Behalf of Class Members that Purchased Jet Fuel in Nevada)**

296.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

297.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Nevada; (2) jet fuel prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

298.    Defendants violated NEV. REV. STAT. ANN. §598A.210 *et seq.*, by entering into an unlawful agreement in restraint of trade in the State of Nevada.

299.    As a result of Defendants' violation of NEV. REV. STAT. ANN. §598A.210 *et seq.*, Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to NEV. REV. STAT. ANN. §598A.210.

## COUNT 21
## NEW HAMPSHIRE
### (On Behalf of Class Members that Purchased Jet Fuel in New Hampshire)

300.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

301.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire crude oil and jet fuel market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized jet fuel prices in the State of New Hampshire at artificially high levels.

302.    During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

303.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.*

304.    Accordingly, Plaintiff and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

## COUNT 22
## NEW MEXICO
### (On Behalf of Class Members that Purchased Jet Fuel in New Mexico)

305.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

306.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Mexico for crude oil and jet fuel by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained and stabilized jet fuel prices in the State of New Mexico at artificially high levels.

307.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

308.    Defendants violated the N.M. STAT.ANN. §57-1-1 *et seq.* (1978), by entering into an unlawful agreement in restraint of trade in the State of New Mexico.

309.    Accordingly, Plaintiff and Members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.* (1978).

## COUNT 23
## NEW YORK
### (On Behalf of Class Members that Purchased Jet Fuel in New York)

310.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

311.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.*

312.    Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and jet fuel was restrained, suppressed, and eliminated

throughout the State of New York, and (2) jet fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York.

313.    During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce.

314.    The conduct set forth above is a per se violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq.*

315.    Accordingly, Plaintiff and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

**COUNT 24**
**NORTH CAROLINA**
**(On Behalf of Class Members that Purchased Jet Fuel in North Carolina)**

316.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

317.    Plaintiff and Members of the Class purchased jet fuel not for resale in North Carolina during the Class Period.

318.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq.*

319.    Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) jet fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina.

320.    During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce.

321.    Accordingly, Plaintiff and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq.*

## COUNT 25
## NORTH DAKOTA
**(On Behalf of Class Members that Purchased Jet Fuel in North Dakota)**

322.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

323.    Defendants' actions have violated the N.D. CENT. CODE §51-08.1-01 *et seq.* through their anticompetitive actions.

324.    Through their actions and actions of co-conspirators, jet fuel prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class.

325.    Throughout the Class Period, price competition in the market for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of North Dakota.

326.    Plaintiff and members of the Class, including those who resided in the State of North Dakota and purchased jet fuel there, paid supra-competitive, artificially inflated prices.

327.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota.

328.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq.*

## COUNT 26
## OREGON
**(On Behalf of Class Members that Purchased Jet Fuel in Oregon)**

329.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

330.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Oregon; (2) jet fuel prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

331.    During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

332.    Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq.*

333.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725 *et seq.*

**COUNT 27**
**RHODE ISLAND**
**(On Behalf of Class Members that Purchased Jet Fuel in Rhode Island)**

334.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

335.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Rhode Island for crude oil and jet fuel market by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized jet fuel prices in the State of Rhode Island at artificially high levels.

336.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

337.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. GEN. LAWS §6-36-7 *et seq.*

338.    Accordingly, Plaintiff and Members of the Class seek all relief available under R.I. GEN. LAWS §6-36-7 *et seq.*

### COUNT 28
### SOUTH DAKOTA
**(On Behalf of Class Members that Purchased Jet Fuel in South Dakota)**

339.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

340.    Through their actions and actions of co-conspirators, jet fuel prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the Class. Throughout the Class Period, price competition in the market for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of South Dakota.

341.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiff and members of the Class, including those who resided in the State of South Dakota and purchased jet fuel there, paid supra-competitive, artificially inflated prices for their jet fuel.

342.    Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq.*, through their anticompetitive actions.

343.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq.*

## COUNT 29
## TENNESSEE
### (On Behalf of Class Members that Purchased Jet Fuel in Tennessee)

344.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

345.    Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq.*

346.    Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of jet fuel, tangible goods, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for jet fuel, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

347.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee.

348.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq.*

## COUNT 30
## UTAH
### (On Behalf of Class Members that Purchased Jet Fuel in Utah)

349.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

350.    Plaintiff and Members of the Class purchased jet fuel not for resale in Utah during the Class Period.

351.    Defendants violated UTAH CODE ANN. §76-10-3101 *et seq.* by entering into an unlawful agreement in restraint of trade in the State of Utah.

352.     Specifically, Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Utah for the crude oil and jet fuel market by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized jet fuel prices in Utah at artificially high levels.

353.     During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah.

354.     Accordingly, Plaintiff and Members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq.*

## COUNT 31
## VERMONT
**(On Behalf of Class Members that Purchased Jet Fuel in Vermont)**

355.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

356.     Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq.*

357.     Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Vermont; (2) jet fuel prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

358.     During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont.

359.     Accordingly, Plaintiff and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq.*

**COUNT 32**
**WISCONSIN**
**(On Behalf of Class Members that Purchased Jet Fuel in Wisconsin)**

360.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

361.    Plaintiff and Members of the Class purchased jet fuel not for resale in Wisconsin during the Class Period.

362.    Defendants have entered into an unlawful contract and conspiracy in restraint of trade in violation of WIS. STAT. §133.03(1).

363.    Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

364.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and jet fuel was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) jet fuel prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

365.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged herein. *See* WIS. STAT. § 133.18(1)(a).

366.    Accordingly, Plaintiff and members of the Class seek all forms of relief available under WIS. STAT. § 133.03.

II.    **Violations of State Consumer Protection Statutes**

367.    During the Class Period, Defendants engaged in unfair or deceptive acts or practices in violation of the state deceptive trade practices and consumer protection laws pleaded below.

**COUNT 33**
**ALABAMA**
**(On Behalf of Class Members that Purchased Jet Fuel in Alabama)**

368.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

369.    Plaintiff and Members of the Class purchased jet fuel not for resale during the Class Period within, or while residing in, Alabama.

370.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA"), ALA. CODE §§ 8-19-1 *et seq.*, in addition to proscribing numerous categories of conduct, including "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions" (ALA. CODE § 8-19-5(11), declares unlawful the act or practice of "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5(27).

371.    The Alabama DTPA defines a "consumer" as any natural person who buys goods or services for personal, family, or household use. Members of the class are "consumers" under the Alabama DTPA. ALA. CODE § 8-19-3(2).

372.    Defendants, Plaintiff, and the Alabama class members are "persons" under ALA. CODE § 8-19-3(3).

373.    Each Defendant is and was engaged in "trade or commerce" under the meaning of ALA. CODE § 8-19-3(8).

374.    Defendants violated the Alabama DTPA by engaging in a collusive conspiracy with one another, OPEC+, and other co-conspirators to suppress the availability of oil, thereby fixing the price of oil at an artificially high level and leading to artificially high prices for jet fuel.

375.    These violations caused monetary harm to Members of the Class and are likely to cause future harm to consumers if Defendants' practices are not enjoined.

376.    Plaintiff seeks all available remedies for Defendants' violation of the Alabama DTPA, including monetary relief under ALA. CODE § 8-19-10 and injunctive relief and other remedies available under ALA. CODE §§ 8-19-1, *et seq.*

377.    In addition to the substantive conspiracy, in furtherance of the conspiracy numerous defendants made representations to the public concerning the nature and existence of the conspiracy and its effects on oil prices, and those statements were misleading to reasonable consumers. For example, representations that the parties had not come to an agreement on oil output are materially misleading to reasonable consumers where, in fact, Defendants had agreed with one another and co-conspirators to illegally fix the price of oil.

378.    Plaintiff will send Defendants written notices complying with ALA. CODE § 819-10(e) concurrently with the filing of this Complaint. This count is a placeholder only, and the count will be formally asserted 15 days after the notices are sent, should Defendants fail or refuse to remedy their unlawful conduct.

## COUNT 34
## ARIZONA
### (On Behalf of Class Members that Purchased Jet Fuel in Arizona)

379.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

380. Plaintiff and the Class purchased retail jet fuel during the Class Period within, or while residing in, Arizona.

381. Plaintiff, Defendants, and the Arizona class members are "persons" under the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

382. The crude oil produced by Defendants and the jet fuel purchased by Plaintiff are both "merchandise" under ARIZ. REV. STAT. § 44-1521(5).

383. The Arizona CFA provides that the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522.

384. Defendants' conduct in conspiring, cooperating, and colluding with one another and co-conspirators to reduce oil output thereby fixing the price of jet fuel at an artificially high price constitutes a deceptive or unfair act or practice under the Act.

385. Arizona has enacted a Federal Trade Commission Act ("FTC Act") harmonization provision, such that conduct that is "unfair" under the FTC Act, which includes practices that violate the Sherman Act and other antitrust laws, constitutes unfair practices under Arizona CFA.

386. For the reasons set forth above, Defendants have violated the state and federal antitrust laws, such that its conduct is "unfair" under the FTC Act and therefore constitutes a violation of Arizona's Consumer Fraud Act.

387. In addition to the substantive conspiracy, in furtherance of the conspiracy numerous defendants made representations to the public concerning the nature and existence of

the conspiracy and its effects on oil prices, and those statements were misleading to reasonable consumers. For example, representations that the parties had not come to an agreement on oil output are materially misleading to reasonable consumers where, in fact, Defendants had agreed with one another and coconspirators to illegally fix the price of oil.

388.    Defendants knew, or should have known, that their conduct violated and violates the Arizona CFA.

389.    Defendants' violations constitute a continuing risk to Plaintiff and the Arizona class members as well as to the general public, such that enjoining Defendants' unlawful acts and practices is in the public interest.

390.    These violations caused monetary harm to Plaintiff and the Class, and are likely to cause future harm to consumers if Defendants' practices are not enjoined.

391.    Plaintiff seeks all available remedies for Defendants' violation of the Arizona CFA, including monetary, injunctive, and declaratory relief as appropriate.

**COUNT 35**
**CALIFORNIA**
**(On Behalf of Class Members that Purchased Jet Fuel in California)**

392.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

393.    The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.* of California Business and Professions Code, the California Unfair Competition Law ("California UCL").

394.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the California UCL by engaging in the acts and practices specified above.

395.    Plaintiff purchased jet fuel in California during the Class Period.  Members of the Class purchased jet fuel in California during the Class Period for personal, family, or household use.

396.    This claim is instituted pursuant to sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

397.    The Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

398.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

399.    Members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

400.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

401.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Class to pay

supra-competitive and artificially-inflated prices for jet fuel sold in the State of California. Members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

402.    Defendants knew or should have known that their conduct violates the California UCL.

403.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

### COUNT 36
### COLORADO
### (On Behalf of Class Members that Purchased Jet Fuel in Colorado)

404.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

405.    Plaintiff and Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Colorado.

406.    Defendants constitute "persons" under the Colorado Consumer Protection Act ("Colorado CPA").

407.    The Colorado CPA prohibits "deceptive trade practices" generally and includes a non-exhaustive list of enumerated practices, including "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an

advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105(1)(u).

408.    By failing to disclose the nature, existence, and effect of their price fixing conspiracy, Defendants "fail[ed] to disclose material information concerning goods" and "such failure ... was intended to induce the consumer to enter into a transaction." It would be material to a reasonable consumer to learn that the price of jet fuel has been artificially augmented as a result of an unlawful price-fixing conspiracy.

409.    In addition to the substantive conspiracy, in furtherance of the conspiracy numerous Defendants made representations to the public concerning the nature and existence of the conspiracy and its effects on oil prices, and those statements were misleading to reasonable consumers. For example, representations that the parties had not come to an agreement on oil output are materially misleading to reasonable consumers where, in fact, Defendants had agreed with one another and coconspirators to illegally fix the price of oil.

410.    Defendants' unfair and deceptive acts or practices, misrepresentations, and omissions were material to members of the Class. In particular, failure to inform members of the Class that the price of jet fuel had been raised due to a price-fixing conspiracy was material to class members' decision to purchase jet fuel.

411.    These violations caused monetary harm to the Class and are likely to cause future harm to consumers if Defendants' practices are not enjoined.

412.    Defendants' violations constitute a continuing risk to Class members as well as to the general public, such that enjoining Defendants' unlawful acts and practices is in the public interest.

413.    Plaintiff seeks all available remedies for Defendants' violation of the Colorado

CPA, including monetary, treble, punitive, injunctive, and declaratory relief as appropriate.

COLO. REV. STAT. § 6-1-113.

## COUNT 37
## CONNECTICUT
### (On Behalf of Class Members that Purchased Jet Fuel in Connecticut)

414.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

415.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides that

"[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce."

416.    Members of the Class purchased retail jet fuel during the Class Period within, or

while residing in, Connecticut.

417.    Defendants are "persons" under Connecticut UTPA. CONN. GEN. STAT. § 42-

110a(3).

418.    Defendants were and are engaged in "trade or commerce" under CONN. GEN.

STAT. § 42-110a(4) as they were producing and distributing oil for profit.

419.    Members of the Class purchased jet fuel for personal, family, or household

purposes.

420.    Connecticut has enacted a Federal Trade Commission Act ("FTC Act")

harmonization provision, such that conduct that is "unfair" under the FTC Act, which includes

practices that violate the Sherman Act and other antitrust laws, constitutes unfair practices under

Connecticut UTPA. For the reasons set forth above, Defendants have violated the state and federal

antitrust laws, such that its conduct is "unfair" under the FTC Act and therefore constitutes a violation of the Connecticut UTPA.

421.    In addition, Defendants deceptively failed to reveal the material fact that the oil being sold has had its price artificially boosted by an illegal price-fixing conspiracy.

422.    In addition to the substantive conspiracy, in furtherance of the conspiracy numerous defendants made representations to the public concerning the nature and existence of the conspiracy and its effects on oil prices, and those statements were misleading to reasonable consumers. For example, representations that the parties had not come to an agreement on oil output are materially misleading to reasonable consumers where, in fact, Defendants had agreed with one another and coconspirators to illegally fix the price of oil.

423.    Defendants knew or should have known that their conduct violates the Connecticut UTP.

424.    Defendants' unfair and deceptive acts or practices, omissions, and misrepresentations were material to members of the Class and were likely to deceive reasonable consumers, including members of the Class, which it did. In particular, failure to inform members of the Class that the price of jet fuel had been raised due to a price-fixing conspiracy was material to class members' decision to purchase jet fuel.

425.    These violations caused monetary harm to members of the Class and are likely to cause future harm to consumers if Defendants' practices are not enjoined.

426.    Defendants' violations constitute a continuing risk to members of the Class as well as to the general public, such that enjoining Defendants' unlawful acts and practices is in the public interest.

427.    Defendants acted with a reckless indifference to the rights of the Class, and their conduct constituted an aggravated, deliberate disregard for those rights.

428.    Plaintiff seeks all available remedies for Defendants' violation of the Connecticut UTPA, including monetary, injunctive, and declaratory relief as appropriate under CONN. GEN. STAT. § 42-110g.

**COUNT 38**
**DISTRICT OF COLUMBIA**
**(On Behalf of Class Members that Purchased Jet Fuel in the District of Columbia)**

429.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

430.    The violations of federal antitrust law set forth above also constitute violations of section 28-3901, *et seq.* of the District of Columbia Code.

431.    Plaintiff or Class Members purchased jet fuel in the District of Columbia or resided in the District of Columbia when they purchased jet fuel.

432.    Defendants agreed to, and did in fact, act in restraint of trade of commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which jet fuel was sold, distributed, or obtained in the District of Columbia.

433.    The foregoing conduct constitutes unfair or deceptive trade practices within the meaning of D.C. CODE § 28-3904. Class members were not aware of Defendants' price-fixing conspiracy and were therefore deprived of free and open competition. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for end-users of jet fuel and a gross disparity between the price paid and the value received for jet fuel.

434.    Defendants' conduct substantially affected District of Columbia commerce.

435.     As a direct and proximate result of Defendants' unlawful conduct, class members were injured and are threatened with further injury. Accordingly, Plaintiff seeks all relief available under District of Columbia Code § 28-4502, *et seq.*

**COUNT 39**
**FLORIDA**
**(On Behalf of Class Members that Purchased Jet Fuel in Florida)**

436.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

437.     Defendants have engaged in unfair, unconscionable, or deceptive acts or practices in violation of FLA. STAT. § 501.201(1).

438.     Plaintiff and Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Florida.

439.     The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLORIDA STAT. § 501.204(1).

440.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLORIDA STAT. § 501.202(2). The members of the Florida class are covered by this statute.

441.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

442.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. FLA. STAT. § 501.211(a) ("...anyone aggrieved by a violation of this [statute] may bring an action...").

443.    Members of the Class purchased jet fuel within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of jet fuel would have been lower, in an amount to be determined at trial.

444.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel market, a substantial part of which occurred within Florida.

445.    Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for jet fuel, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level.

446.    Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

447.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

448.    Defendants knew or should have known that their conduct violates the FDUTPA.

449.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by virtue of overcharges for jet fuel and are threatened with further injury.

450.    By reason of the foregoing, Plaintiff and the members of the Class seek all forms of relief, including injunctive relief pursuant to FLORIDA STAT. §501.208 and declaratory

judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLORIDA STAT. § 501.211.

## COUNT 40
## HAWAII
### (On Behalf of Class Members that Purchased Jet Fuel in Hawaii)

451.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

452.    The violations of federal antitrust law set forth above also constitute violations of HAWAII REV. STAT. § 480-2.

453.    Defendants have engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of HAWAII REV. STAT. § 480-2. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or noncompetitive levels, the prices at which jet fuel was sold, distributed, or obtained in Hawaii.

454.    Members of the Class purchased jet fuel in Hawaii and/or purchased jet fuel while residing in Hawaii at the time of their purchases.

455.    Defendants' unlawful conduct had the following effects: (1) jet fuel price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) jet fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for jet fuel.

456.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

457.    Defendants knew or should have known that their conduct violates HAWAII REV. STAT. § 480-2.

458.    As a direct and proximate result of Defendants' unlawful conduct, members of the Class were injured and are threatened with further injury. Accordingly, Plaintiff seeks all relief available under the statute.

**COUNT 41**
**ILLINOIS**
**(On Behalf of Class Members that Purchased Jet Fuel in Illinois)**

459.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

460.    By reason of the conduct alleged herein, Defendants have violated 740 ILL. COMP. STAT. ANN. 10/3(1), *et seq.*

461.    Member of the Class purchased retail jet fuel during the Class Period within, or while residing in, Illinois.

462.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel market, a substantial part of which occurred within Illinois.

463.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the jet fuel Market.

464.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

465.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

466.    Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

467.    Defendants knew or should have known that their conduct violates 740 ILL. COMP. STAT. ANN. 10/3(1), et seq.

468.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury. The members of the Class are within the scope of the Illinois statute.

469.    By reason of the foregoing, Plaintiff and members of the Class seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 ILL. COMP. STAT. ANN. 505/10a, *et seq.*

**COUNT 42**
**IOWA**
**(On Behalf of Class Members that Purchased Jet Fuel in Iowa)**

470.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

471.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Iowa.

472.    Members of the Class are "consumers" under IOWA CODE § 714H.2 as they are natural persons.

473.    Defendants are "persons" under IOWA CODE § 714H.2 as Defendants are business entities.

474.    Crude oil and jet fuel are both "merchandise" under IOWA CODE § 714H.3 as they are "goods" and "commodities."

475.    IOWA CODE § 714H.3 provides that a "person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes." IOWA CODE § 714H.3(1).

476.    Defendants, in engaging in a price-fixing conspiracy to fix the price of oil, and in their actions to conceal and suppress knowledge of this illegal scheme, engaged in "a practice or act" which Defendants know or reasonably should know "is an unfair practice, deception, fraud, false pretense, or false promise" and further engaged in the "misrepresentation, concealment, suppression, or omission of a material fact" i.e. the fact that the price has not been set by competitive market forced but by an illegal price-fixing conspiracy. The concealment related to the material fact of price, which is material for reasonable consumers such as Plaintiff and the Class.

477.    Defendants' conduct therefore constitutes an "unfair practice" under IOWA CODE § 714H.2 and IOWA CODE § 714.16.

478.    A person who has been damaged by consumer fraud may bring a civil action. IOWA CODE § 714H.5(1).

479.    By selling oil with a price that has been set by a price-fixing conspiracy without disclosure of that fact, Defendants "concealed," "suppressed," or "omitted" a "material fact with

intent that others rely" on that concealment. Under the Iowa Code, such conduct constitutes an "unlawful act."

480.    In addition to the substantive conspiracy, in furtherance of the conspiracy numerous defendants made representations to the public concerning the nature and existence of the conspiracy and its effects on oil prices, and those statements were misleading to reasonable consumers. For example, representations that the parties had not come to an agreement on oil output are materially misleading to reasonable consumers where, in fact, Defendants had agreed with one another and coconspirators to illegally fix the price of oil.

481.    Defendants knew or should have known that their conduct violates IOWA CODE § 714H.3.

482.    Defendants' unfair and deceptive acts or practices, omissions, and misrepresentations were material to Members of the Class and were likely to deceive reasonable consumers, including Members of the Class, which it did. In particular, failure to inform Members of the Class that the price of jet fuel had been raised due to a price fixing conspiracy was material to Class members' decision to purchase jet fuel. Defendants intended that Members of the Class rely on their concealment, which they did in purchasing jet fuel in Iowa.

483.    Members of the Class were otherwise unaware of the true facts of Defendants' price-fixing conspiracy.

484.    Members of the Class suffered an ascertainable loss of money in the form of excessive prices paid for jet fuel in Iowa.

485.    Defendants conduct constitutes willful and wanton disregard for the rights of Members of the Class, as they violated longstanding antitrust laws and concealed evidence thereof, knowing that this conduct would unlawfully increase the price of jet fuel for Members of

the Class. Defendants' conduct was knowing and intentional and not the product of any bona fide error.

486.    These violations caused monetary harm to Members of the Class and are likely to cause future harm to consumers if Defendants' practices are not enjoined.

487.    Defendants' violations constitute a continuing risk to Members of the Class as well as to the general public, such that enjoining Defendants' unlawful acts and practices is in the public interest.

488.    Defendants acted with a reckless indifference to the rights of Members of the Class, and their conduct constituted an aggravated, deliberate disregard for those rights.

489.    Plaintiff seeks all available remedies for Defendants' violation of the Iowa Code, including monetary, statutory, treble, injunctive, and declaratory relief as appropriate under IOWA CODE § 714.H.5.

**COUNT 43**
**KANSAS**
**(On Behalf of Class Members that Purchased Jet Fuel in Kansas)**

490.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

491.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Kansas.

492.    The Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. ANN. § 50-626(a), provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." In addition to this general prohibition, which Defendants violate, the statute provides that "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact" constitutes a deceptive act or practice, as does "making

false or misleading representations, knowingly or with reason to know, of fact concerning the price in comparison to prices of competitors or one's own price at a past or future time." KAN. STAT. ANN. § 50-626(3), (7).

493.    Members of the Class are "consumers" under the statute as they are "individual[s] ... who seek[] or acquire property ... for personal, family, household, business, or agricultural purposes." KAN. STAT. ANN. § 50-624(b).

494.    Defendants are "persons" under the statute as they are corporations or other legal entities. KAN. STAT. ANN. § 50-624(i).

495.    Defendants are also "suppliers" under the statute as they are manufacturers, distributors, sellers, or other persons who, in the ordinary course of business, engages in ... consumer transactions, whether or not dealing directly with the consumer." KAN. STAT. ANN. § 50-624(l).

496.    The sale of jet fuel in Kansas to Members of the Class constituted "consumer transactions" under KAN. STAT. ANN. § 50-624(c) as it involved the "sale ... or other disposition for value of property ... within this state."

497.    Defendants violated the general prohibition of KAN. STAT. ANN. § 50-626(a) as they engaged in an unlawful price-fixing conspiracy to raise the price of oil, leading to price increases in jet fuel nationwide, including in Kansas. Illegal price fixing is a fundamentally deceptive practice.

498.    Additionally, Defendants violate the prohibitions on concealing material fact, generally and as to price. The fact that the price paid for jet fuel by Members of the Class has been artificially raised by an illegal price-fixing conspiracy is a material consideration for reasonable consumers such as Members of the Class. Members of the Class reasonably relied on

the assumption that the price had been set by ordinary competitive market forces rather than enhanced through an illegal price-fixing conspiracy.

499.    In addition to the substantive conspiracy, in furtherance of the conspiracy numerous defendants made representations to the public concerning the nature and existence of the conspiracy and its effects on oil prices, and those statements were misleading to reasonable consumers. For example, representations that the parties had not come to an agreement on oil output are materially misleading to reasonable consumers where, in fact, Defendants had agreed with one another and co-conspirators to illegally fix the price of oil.

500.    Defendants knew or should have known that their conduct violated the Kansas CPA.

501.    Defendants' unfair acts, practices, and conduct was material to Members of the Class, who relied on the assumption that jet fuel prices had been set by regular competitive market forces rather than an illegal price-fixing conspiracy.

502.    Members of the Class suffered financial injury as a result of the violation, paying more than they should for jet fuel in Kansas.

503.    Under KAN. STAT. ANN. § 50-623 Plaintiff seeks all available relief including but not limited to declaratory and injunctive relief and reasonable attorney's fees.

### COUNTS 44 & 45
### MAINE
### (On Behalf of Class Members that Purchased Jet Fuel in Maine)

504.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

505.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Maine.

506.    Maine UTPA: Defendants and the Maine class members are "persons" under the Maine Unfair Trade Practices Act ("Maine UTPA"), ME. REV. STAT. ANN. TIT. 5, § 206(2). Members of the Class are natural persons and Defendants are corporations or other legal entities.

507.    Defendants' violations occurred within "trade and commerce" under the statute as it involved the advertising, offering for sale, sale or distribution of tangible property or any other commodity or thing of value and directly or indirectly affected the people of Maine. ME. REV. STAT. ANN. TIT. 5, § 206(2)

508.    Maine has enacted a Federal Trade Commission Act ("FTC Act") harmonization provision, such that conduct that is "unfair" under the FTC Act, which includes practices that violate the Sherman Act and other antitrust laws, should guide courts to finding unfair practices under the Maine act. For the reasons set forth above, Defendants have violated the state and federal antitrust laws, such that its conduct is "unfair" under the FTC Act and therefore constitutes a violation of ME. REV. STAT. ANN. TIT. 5, § 206.

509.    ME. REV. STAT. ANN. TIT. 5, § 206 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

510.    Defendants' conduct in conspiring with ostensible competitors at home and abroad to reduce output and thereby fix the price of oil constituted the paradigmatic case of unfair competition—a per se price-fix—and therefore violated the statute.

511.    In addition, by violating the Sherman Act, Defendants violated the FTC Act and thus the Maine FTC harmonization provision at ME. REV. STAT. ANN. TIT. 5, § 206.

512.    Defendants' conduct in misrepresenting the nature, existence, and effects of the illegal conspiracy, including through representations made to media, constitute further unfair and deceptive practices under the statute.

513.    Defendants' violations have benefitted them, allowing them to obtain unreasonably and unlawfully high supracompetitive rates for their crude oil.

514.    Class members request all available relief under ME. REV. STAT. ANN. TIT. 5, § 213 for Defendants violations of ME. REV. STAT. ANN. TIT. 5, § 206, including but not limited to injunctive relief, restitution, and reasonable attorney's fees, and will seek damages upon amendment of this Complaint following the expiration of the statutory notice period of ME. REV. STAT. ANN. TIT..5, § 213(1-A). Plaintiff will send a settlement offer pursuant to ME. REV. STAT. ANN. TIT. 5, § 213(1-A) and will amend this Complaint thirty days after that mailing to include a claim for damages.

515.    Maine UDTPA: Defendants have also violated the Maine Uniform Deceptive Trade Practices Act ("Maine UDTPA"), ME. REV. STAT. ANN. TIT. 10, § 1211 *et seq.*

516.    Defendants are "persons" under the act as they are corporations or legal or commercial entities. ME. REV. STAT. ANN. TIT. 10, § 1211(5).

517.    Defendants violated ME. REV. STAT. ANN. TIT. 10, § 1212(1) as they "cause[] likelihood of confusion or of misunderstanding as to affiliation, connection or association with ... another." Specifically, by failing to disclose the nature of the price-fixing conspiracy, Defendants caused a highly likely belief among reasonable consumers that the Defendants were individual competitors acting in their individual rational self-interest rather than acting as a cartel to fix the price of oil.

518.    Defendants have also engaged in "other conduct which similarly creates a likelihood of confusion or of misunderstanding" by misleading the public about the existence and nature of their illegal cartel.

519.    Defendants' misconduct was material to class members and reasonable consumers as it concerned the material fact of price, and a reasonable consumer appropriately assumes that jet fuel prices are set by ordinary competitive market forces rather than unlawful price-fixing conspiracies.

520.    Defendants' illegal misconduct is ongoing and continues to violate the Maine UTPA and Maine UDTPA.

521.    Defendants knew or should have known that their conduct was in violation of Maine UTPA and Maine UDTPA.

522.    Defendants' unfair and deceptive conduct was substantial, with substantial effects on global oil prices and revenues, and on the price of downstream products such as jet fuel. Defendants' conduct is not outweighed by any countervailing benefit to consumers or competitors as it is a naked price-fixing scheme which has been illegal for a century which only hurts consumers and competition.

523.    Plaintiff and the class suffered financial injury as a result of the violations of Maine UTPA and Maine UDTPA, paying more than they should for jet fuel in Maine. Members of the class purchased jet fuel, which is a "good" and "property" under ME. REV. STAT. TIT. 5, § 213, primarily for personal, family, or household purposes.

524.    Defendants' conduct was willful for the purposes of Maine UDPA § 1213 as Defendants took numerous intentional acts in violation of the law for the purpose of reducing oil output and fixing prices.

525.    Plaintiff seeks all available relief under Maine UDPA § 1213, including but not limited to injunctive relief and reasonable attorney's fees.

### COUNT 46
### MARYLAND
### (On Behalf of Class Members that Purchased Jet Fuel in Maryland)

526.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

527.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Maryland.

528.    Defendants, and Maryland class members are "persons" under the Maryland Consumer Protection Act ("Maryland CPA"), MD. CODE COM. LAW § 13-101(h), as members of the Class are natural persons and Defendants are corporations or other legal or commercial entities.

529.    Defendants are "merchants" under the statute as they "directly or indirectly ... offer[] or make[] available to consumers any consumer goods..." MD. CODE COM. LAW § 13-101(h).

530.    Members of the Class are "consumers" under the statute as they are actual or prospective purchasers of jet fuel, which is a consumer good.

531.    Maryland has enacted a Federal Trade Commission Act ("FTC Act") harmonization provision, such that conduct that is "unfair" under the FTC Act, which includes practices that violate the Sherman Act and other antitrust laws, should guide courts to finding unfair practices under the Maryland act. For the reasons set forth above, Defendants have violated the state and federal antitrust laws, such that its conduct is "unfair" under the FTC Act and therefore constitutes a violation of MD. CODE COM. LAW § 13-105.

532.    The Maryland CPA states that "[u]nfair, abusive, or deceptive trade practices include" several species of enumerated bad conduct. This includes a representation that a "merchant has ... affiliation, or connection which he does not have" (MD. CODE COM. LAW § 13-301(2)(ii).) Also included is "[f]ailure to state a material fact if the failure tends to deceive." MD. CODE COM. LAW § 13-301(3). Also included is a prohibition on "[d]eception, fraud, false pretense, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) The promotion or sale of any consumer goods...". MD. CODE COM. LAW § 13-301(9).

533.    Defendants violated MD. CODE COM. LAW § 13-301(2)(ii) as they misrepresented the existence and nature of the cartel to the general public, including via the media.

534.    Defendants violated MD. CODE COM. LAW § 13-301(3) as they failed to disclose the material fact that the price of oil, and in turn jet fuel, has been set not by ordinary competitive market forces but through an unlawful price-fixing conspiracy.

535.    Defendants violated MD. CODE COM. LAW § 13-301(9) as Defendants failed to disclose and concealed and suppressed the material fact that the price of oil had been significantly impacted by their participation in an unlawful price-fixing conspiracy.

536.    Defendants engaged in the unfair, abusive, or deceptive trade practices in the sale of consumer goods under the Maryland CPA, as the scheme impacted the price of jet fuel, which is a consumer good. MD. CODE COM. LAW § 13-303(6).

537.    Defendants acted willfully in their violations, undertaking numerous individual acts in furtherance of the illegal cartel.

538.    Defendants knew or should have known that their conduct violates the Maryland CPA.

539.    Defendants' unfair, abusive, and deceptive acts and omissions were material to Members of the Class as they pertained to the price of the good, which is material to a reasonable consumer, and because reasonable consumers are entitled to assume that prices for jet fuel have been set via the ordinary competitive process rather than through a price-fixing cartel.

540.    Members of the class suffered financial injury as a result of Defendants' unlawful misconduct, paying more for jet fuel than they would have absent the conspiracy and deception.

541.    Defendants' violations constitute a continuing risk to members of the Class and the general public.

542.    Plaintiff seeks all available relief under MD. CODE COM. LAW § 13-408, including but not limited to damages, injunctive and declaratory relief, and reasonable attorney's fees.

## COUNT 47
## MASSACHUSETTS
### (On Behalf of Class Members that Purchased Jet Fuel in Massachusetts)

543.    Plaintiff incorporates each allegation in the preceding paragraphs of this Complaint.

544.    By reason of the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS Ch. 93A § 2, *et seq.*

545.    Members of the Class purchased retail jet fuel within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

546.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

547.    Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

548.    Members of the Class purchased goods, namely retail jet fuel, primarily for personal, family, or household purposes.

549.    As a direct and proximate cause of Defendants' unlawful conduct, Members of the Class have been injured in their business or property and are threatened with further injury.

550.    By reason of the foregoing, Plaintiff and members of the Class seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Massachusetts General Laws Ch. 93A § 9.

551.    The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply as to Defendants because, upon information and belief, Defendants have not identified a place of business or assets within Massachusetts.

### COUNT 48
### MICHIGAN
### (On Behalf of Class Members that Purchased Jet Fuel in Michigan)

552.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

553.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Michigan.

554.    Members of the Class members are "person[s]" under the Michigan Consumer Protection Act ("Michigan CPA") as they are individuals. MICH. COMP. LAWS § 445.902(d).

555.    Defendants are "person[s]" under the Michigan CPA as they are corporations, limited liabilities companies, or other legal entities. MICH. COMP. LAWS § 445.902(d).

556.    Defendants misconduct occurred within "trade or commerce" under the act as Defendants conducted a business providing goods, property, or service primarily for personal, family, or household purposes. MICH. COMP. LAWS § 445.902(g).

557.    The Michigan CPA provides that "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful..." and provides numerous enumerated violations. MICH. COMP. LAWS § 445.903(1). Violations include "[r]epresenting that ... a person has ... affiliation, or connection that he or she does not have." MICH. COMP. LAWS § 445.903(c). The statute also bars "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." MICH. COMP. LAWS § 445.903(s). The statute also bars "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(cc). The statute also prohibits "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold." MICH. COMP. LAWS § 445.903(z)

558.    Defendants violate § 445.903(c) as they conceal and do not disclose their affiliation with one another and with OPEC+, namely their entrance into an illegal cartel with these entities.

559.    Defendants violate § 445.903(s) as they concealed and failed to disclose to Members of the Class and the public the fact that the price of their products had been unlawfully augmented via a price-fixing scheme. Defendants' participation in the secret price-fixing scheme could not have been known by Plaintiff and the class.

560.    Defendants violate § 445.903(cc) as they failed to disclose the nature, existence, and effect of the cartel while making representations, including to the media, that suggested the price increases were due to individual acts of "discipline" and similar representations which sought to paint the cartel in a positive light and disguise its true nature.

561.    Defendants violate § 445.903(z) as, by artificially inflating the price of oil, Defendants charged members of the Class a price that is grossly in excess of the price at which jet fuel is sold absent a cartel.

562.    Michigan has enacted a Federal Trade Commission Act ("FTC Act") harmonization provision, such that conduct that is "unfair" under the FTC Act, which includes practices that violate the Sherman Act and other antitrust laws, should guide courts to finding unfair practices under the Michigan act. For the reasons set forth above, Defendants have violated the state and federal antitrust laws, such that its conduct is "unfair" under the FTC Act and therefore constitutes a violation of MICH. COMP. LAWS § 445.911(4)(c).

563.    Defendants' conduct was material to the Class as it affected price, which is a material term of a transaction for a reasonable consumer such as Plaintiff and the class.

564.    Members of the class suffered financial injury as a result of Defendants' violations as they paid more for retail jet fuel than they would have absent the conspiracy.

565.    Defendants conduct was at all times willful, with Defendants undertaking numerous actions in furtherance of the cartel, despite knowledge of the effects of their actions on parties such as Plaintiff.

566.    Defendants knew or should have known that they conduct violates the Michigan CPA.

567.    Members of the Class seek all relief available under MICH. COMP. LAWS § 445.911, including but not limited to declaratory relief, injunctive relief, actual damages, and other appropriate relief.

568.    Michigan members of the class also seek punitive damages against the Defendants as their conduct was despicable and undertaken with willful and conscious disregard for the rights of others.

## COUNT 49
## MINNESOTA
### (On Behalf of Class Members that Purchased Jet Fuel in Minnesota)

569.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

570.    By reason of the conduct alleged herein, Defendants have violated MINN. STAT. § 325F.68, *et seq.*

571.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Minnesota.

572.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

573.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the jet fuel market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the jet fuel market.

574.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

575.    Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

576.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

577.    Defendants' conduct was willful.

578.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury. The members of the Class are within the scope of the Minnesota statute.

579.    By reason of the foregoing, Plaintiff and the members of the Class seek all forms of relief, including damages, reasonable attorneys' fees and costs under MINN. STAT. § 325F.68, *et seq.* and applicable case law.

## COUNT 50
## MONTANA
### (On Behalf of Class Members that Purchased Jet Fuel in Montana)

580.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

581.    By reason of the conduct alleged herein, Defendants have violated MONT. CODE, §§ 30-14-101, *et seq.*

582.    Members of the Class purchased jet fuel in Montana or resided in Montana when they purchased jet fuel.

583.    Defendants' unlawful conduct had the following effects: (1) jet fuel price competition was restrained, suppressed, and eliminated throughout Montana; (2) jet fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3)

Class members were deprived of free and open competition; and (4) Class members paid supracompetitive, artificially inflated prices for jet fuel.

584.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

585.    As a direct and proximate result of Defendants' unlawful conduct, Class members were injured and are threatened with further injury. Accordingly, Plaintiff seeks all relief available under the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq.*

**COUNT 51**
**NEBRASKA**
**(On Behalf of Class Members that Purchased Jet Fuel in Nebraska)**

586.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

587.    By reason of the conduct alleged herein, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq.*

588.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Nebraska.

589.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel Market, a substantial part of which occurred within Nebraska.

590.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the jet fuel Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

591.    Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

592.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

593.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff's and Class members' ability to protect themselves.

594.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

595.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury. The members of the Class are within the scope of the Nebraska statute.

596.    By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under NEB. REV. STAT. § 59- 1614.

**COUNT 52**
**NEVADA**
**(On Behalf of Class Members that Purchased Jet Fuel in Nevada)**

597.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

598.    By reason of the conduct alleged herein, Defendants have violated NEV. REV. STAT. § 598.0903, *et seq.*

599.    Plaintiff and Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Nevada.

600.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

601.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the jet fuel market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the crude oil and jet fuel market.

602.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

603.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

604.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

605.    Defendants' conduct was willful.

606.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

607.    By reason of the foregoing, the Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993.

**COUNT 53**
**NEW HAMPSHIRE**
**(On Behalf of Class Members that Purchased Jet Fuel in New Hampshire)**

608.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

609.    By reason of the conduct alleged herein, Defendants have violated N.H. REV. STAT. ANN. TIT. XXXI, § 358-A, *et seq.*

610.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, New Hampshire.

611.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel Market, a substantial part of which occurred within New Hampshire.

612.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the jet fuel market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

613.    Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

614.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

615.    Defendants' conduct was willful and knowing.

616.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Class members' ability to protect themselves.

617.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

618.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury. The members of the Class are within the scope of the New Hampshire statute.

## COUNT 54
## NEW MEXICO
### (On Behalf of Class Members that Purchased Jet Fuel in New Mexico)

619.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

620.    By reason of the conduct alleged herein, Defendants have violated N.M. STAT. ANN. §§ 57-12-3, et seq. (1978).

621.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, New Mexico.

622.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel market, a substantial part of which occurred within New Mexico.

623.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the jet fuel market.

624.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

625.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

626.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

627.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico

class members and the price paid by them for jet fuel as set forth in N.M. STAT. ANN. § 57-12-2(E) (2019).

628.     Defendants' conduct was willful.

629.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

630.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. ANN. § 57-12-10.

## COUNT 55
## NEW YORK
### (On Behalf of Class Members that Purchased Jet Fuel in New York)

631.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

632.     By reason of the conduct alleged herein, Defendants have violated New York GEN. BUS. LAW § 349, *et seq.*

633.     Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, New York.

634.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel market, a substantial part of which occurred within New York.

635.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within New York, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the jet fuel market.

636.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New York.

637.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

638.    Defendants' unlawful conduct substantially affected New York's trade and commerce.

639.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New York.

640.    Defendants' conduct was willful.

641.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

642.    By reason of the foregoing, Plaintiff and members of the Class seek all relief available pursuant to N.Y. GEN. BUS. LAW § 349(h).

## COUNT 56
## NORTH CAROLINA
### (On Behalf of Class Members that Purchased Jet Fuel in North Carolina)

643.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

644.    Plaintiff and Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, North Carolina.

645.    By reason of the conduct alleged herein, Defendants have violated N.C. GEN. STAT. § 75-1.1, *et seq.*

646.    Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the jet fuel Market, a substantial part of which occurred within North Carolina.

647.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

648.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

649.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

650.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

651.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

652.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury. The members of the Class are within the scope of the North Carolina statute.

653.    By reason of the foregoing, the Plaintiff and the members of the Class seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

**COUNT 57**
**NORTH DAKOTA**
**(On Behalf of Class Members that Purchased Jet Fuel in North Dakota)**

654.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

655.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, North Dakota.

656.    The North Dakota Consumer Fraud Act ("NDCFA") prohibits the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby...". Also prohibited is the "act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition..." N.D. CENT. CODE § 51-15-02.

657.    Plaintiff, the class and Defendants are "persons" under the act as they are natural persons, corporations, limited liability companies, companies, or business entities. N.D. CENT. CODE § 51-15-01(4).

658.    Defendants' product is "merchandize" under the act as it is accurately described as "objects, wares, goods, [or] commodities..." N.D. CENT. CODE § 51-15-01(3).

659.    Defendants' misconduct concerned "sales" under the act as it related to the sale, offer of sale, or attempt to sell Defendants' merchandise. N.D. CENT. CODE § 51-15-01(5).

660.    Defendants' conduct in creating, concealing, and maintaining an oil cartel constitutes a deceptive act and practice under the NDCFA.

661.    Defendants knowingly committed the acts that violate the NDCFA, such that Class members are entitled to up to three times actual damages and reasonable attorney's fees. N.D. CENT. CODE § 51-15-09. Plaintiff and the Class seek all relief available under the NDCFA, including actual damages, treble damages, injunctive relief as appropriate, declaratory relief, and reasonable attorney's fees.

## COUNT 58
## OREGON
### (On Behalf of Class Members that Purchased Jet Fuel in Oregon)

662.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

663.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Oregon.

664.    By reason of the conduct alleged herein, Defendants have violated OR. REV. STAT. § 646.608, *et seq.*

665.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel Market, a substantial part of which occurred within Oregon.

666.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the jet fuel Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

667. Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce. Members of the Class are within the scope of the Oregon statute.

668. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

669. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff's and Class members' ability to protect themselves.

670. Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

671. As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

672. By reason of the foregoing, the Plaintiff and the members of the Class seek all forms of relief available under OR. REV. STAT. § 646.638.

673. Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.

## COUNT 59
## RHODE ISLAND
### (On Behalf of Class Members that Purchased Jet Fuel in Rhode Island)

674. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

675. Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Rhode Island.

676.    The Rhode Island Unfair Trade Practices and Consumer Protection Act ("RICPA") provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." R.I. GEN. LAWS § 613.1-2.

677.    Defendants' conduct in creating, concealing, and maintaining an illegal oil cartel constitutes the paradigmatic example of unfair methods of competition, and Defendants' efforts to conceal and suppress awareness of the scheme constituted unfair or deceptive practices.

678.    Members of the Class and Defendants are "persons" under the act as they are natural persons, corporations, or other legal entities. R.I. GEN. LAWS § 6-13.1-1(3).

679.    Defendants conduct occurred within "trade or commerce" as that is defined by, inter alia, the sale, offering for sale, and distribution of any property, article, commodity, or thing of value, in this case crude oil.

680.    Rhode Island has enacted a Federal Trade Commission Act ("FTC Act") harmonization provision, such that conduct that is "unfair" under the FTC Act, which includes practices that violate the Sherman Act and other antitrust laws, should guide courts to finding unfair practices under the Rhode Island Act. For the reasons set forth above, Defendants have violated the state and federal antitrust laws, such that its conduct is "unfair" under the FTC Act and therefore constitutes a violation of R.I. GEN. LAWS § 6-13.1-3.

681.    The RICPA specifies several varieties of violation, including "[c]ausing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with ... another." R.I. GEN. LAWS § 6-13.1-1(6)(iii). Defendants violated this provision by failing to disclose the fact they had affiliated and associated in a cartel to the detriment of the general public.

682.    The RICPA also forbids "[e]ngaging in any other conduct that creates a likelihood of confusion or misunderstanding." R.I. GEN. LAWS § 6-13.1-1(6)(xii). It also prohibits

"[e]ngaging in any act or practice that is unfair or deceptive to the consumer." R.I. GEN. LAWS § 6-13.1-1(6)(xiii). It also prohibits "[u]sing any other methods, acts, or practices that mislead or deceive members of the public in a material respect." R.I. GEN. LAWs § 6-13.1-1(6)(xiv).

683.    By concealing, including through partial disclosures, the nature of their relationship with one another and with OPEC+, Defendants violated R.I. GEN. LAWS § 6-13.1-1(6)(xii).

684.    By engaging in, concealing, and maintaining an illegal oil cartel, Defendants violated the prohibition on "engaging in any act or practice that is unfair or deceptive to the consumers." R.I. GEN. LAWS § 6-13.1-1(6)(xiii).

685.    By concealing, including through partial disclosures, the nature of their cartelized relationship with one another and OPEC+, Defendants violated the prohibition on "[u]sing any other methods, acts, or practices that mislead or deceive members of the public in a material respect." R.I. GEN. LAWS § 6-13.1-1(6)(xiv).

686.    Defendants' violations were material to members of the class as they increased the price of jet fuel, and price is a material term for reasonable consumers such as members of the class.

687.    Members of the Class suffered an ascertainable loss of money or property as a result of Defendants' violations in the form of inflated prices paid for retail jet fuel.

688.    Members of the class are entitled to recover the greater of actual damages or $500 under R.I. GEN. LAWS § 6-13.1-5.2(a). Plaintiff and the class additionally seek all other relief available under R.I. GEN. LAWS § 6-13.1-5.2, including actual damages, statutory damages, treble damages, injunctive relief, reasonable attorney's fees, and any other relief the court deems necessary and proper.

**COUNT 60**
**SOUTH DAKOTA**
**(On Behalf of Class Members that Purchased Jet Fuel in South Dakota)**

689.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

690.    By reason of the conduct alleged herein, Defendants have violated S.D. CODIFIED LAWS § 37-24-6.

691.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, South Dakota.

692.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

693.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the jet fuel market, a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the jet fuel Market.

694.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

695.    Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

696.    Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

697.    Defendants' conduct was willful.

698.    As a direct and proximate cause of Defendants' unlawful conduct, Members of the Class have been injured in their business or property and are threatened with further injury. The members of the Class are within the scope of the South Dakota statute.

699.    By reason of the foregoing, Plaintiff and the members of the Class seek all forms of relief, including actual damages and injunctive relief under S.D. CODIFIED LAWS § 37-24-31.

## COUNT 61
### TENNESSEE
**(On Behalf of Class Members that Purchased Jet Fuel in Tennessee)**

700.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

701.    The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits as "unlawful acts or practices" "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." TENN. CODE ANN. § 47-18-104. By creating, maintaining, and concealing an international oil cartel Defendants violated this prohibition.

702.    Plaintiff and Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Tennessee.

703.    Members of the Class are "consumers" under TENN. CODE ANN. § 47-18103(6) as they sought and acquired by purchase or other disposition any goods, commodity, or thing of value, in this case jet fuel.

704.    Members of the Class and Defendants are "persons" under the Tennessee CPA as they are natural persons, corporations, or any other legal or commercial entity. TENN. CODE ANN. § 47-18-103(18).

705.    The crude oil sold by Defendants and the jet fuel purchased by members of the Class are both "goods" as they are "tangible chattels leased, bought, or otherwise obtained for use by an individual primarily for personal, family, or household purposes...". TENN. CODE ANN. § 47-18-103(12).

706.    Defendants relevant conduct constituted "[t]rade," "commerce," or "consumer transactions" as it involved the "offering for sale ... or distribution of any goods ... commodities, or other things of value wherever situated" as Defendants offered for sale and distributed crude oil, which is a thing of value and a "good." TENN. CODE ANN. § 47-18-103(24).

707.    The Tennessee CPA also designates certain enumerated practices as "unfair or deceptive acts or practices" including "[c]ausing likelihood of confusion or of misunderstanding as to affiliation, connection or association with ... another." TENN. CODE ANN. § 47-18-104(b)(3). Defendants violated this provision by concealing, including through partial disclosures, the nature of their illegal oil cartel.

708.    The Tennessee CPA also includes as an enumerated unlawful practice "[u]nreasonably raising prices or unreasonably restricting supplies of essential goods, commodities or services in direct response to a crime, act of terrorism, war, or natural disaster, regardless of whether such ... occurred in the state of Tennessee." TENN. CODE ANN. § 47-18104(b)(34). Defendants violated this provision by continuing to participate in an oil cartel that unreasonably increased the price of oil, an "essential ... commodity[y]," including in response to the COVID-19 pandemic and the war in Ukraine, which respectively constitute "natural disasters" and "war."

709.    Defendants' conduct has materially affected Plaintiff and the class as it has materially increased the price of retail jet fuel, and price is a material consideration to reasonable consumers such as Plaintiff and the class.

710.    Members of the Class suffered an ascertainable loss of money or property as a result of Defendants' employment of unfair and deceptive practices forbidden by the Tennessee CPA.

711.    Defendants' unfair and deceptive practices were all undertaken willfully by Defendants.

712.    Plaintiff and the class therefore seek all recovery available under TENN. CODE ANN. § 47-18-109.

## COUNT 62
## UTAH
### (On Behalf of Class Members that Purchased Jet Fuel in Utah)

713.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

714.    By reason of the conduct alleged herein, Defendants have violated UTAH CODE ANN. §§ 13-5-1, *et seq.*

715.    Plaintiff and Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Utah.

716.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel market, a substantial part of which occurred within Utah.

717.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred

within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the jet fuel market.

718.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

719.    Defendants' unlawful conduct substantially affected Utah's trade and commerce. As a direct and proximate cause of Defendants' unlawful conduct, Members of the Class have been injured in their business or property and are threatened with further injury.

720.    By reason of the foregoing, Plaintiff and the Class seek all forms of relief, including actual damages or $2,000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under UTAH CODE ANN. §§ 13-5-14, *et seq*.

## COUNT 63
## VERMONT
### (On Behalf of Class Members that Purchased Jet Fuel in Vermont)

721.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

722.    Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Vermont.

723.    Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, inter alia, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. VT. STAT. ANN. TIT. 9 § 2453(a).

724.    One such unfair method of competition is through collusion, defined as agreeing, contracting, combining or conspiring to engage in price fixing, market division and/or allocation

of goods, constituting unfair competition in the commerce of jet fuel. VT. STAT. ANN. TIT. 9, § 2451a(h).

725.    Members of the Class purchased jet fuel within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price of jet fuel would have been lower, in an amount to be determined at trial.

726.    Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this Complaint. VT. STAT. ANN. TIT. 9, § 2465(b).

727.    Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of VT. STAT. ANN. TIT. 9, § 2453, *et seq.*

728.    Members of the Class were injured with respect to purchases of jet fuel in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees. The members of the Vermont Class are within the scope of the Vermont statute.

## COUNT 64
## WISCONSIN
### (On Behalf of Class Members that Purchased Jet Fuel in Wisconsin)

729.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

730.    Plaintiff and Members of the Class purchased retail jet fuel during the Class Period within, or while residing in, Wisconsin.

731.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the jet fuel market, to suppress innovation and consumer choice.

732.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Wisconsin, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the jet fuel market.

733.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Wisconsin.

734.    Defendants' unlawful conduct substantially affected Wisconsin's trade and commerce.

735.    Defendants' conduct constituted unfair or deceptive acts or practices as set forth in WISC. STAT. § 100.18, *et seq.*

736.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

737.    By reason of the foregoing, the Class is entitled to all relief available under Wisc. Stat. § 100.18, *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Classes of all others similarly situated, demands that the Court grant judgment against Defendants as follows:

1.    The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiff as a Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, once certified;

2.    The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof

by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above;

3.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

4.     The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and Class Members for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

5.     The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated:  August 15, 2024

*/s/ Jessica M. Hernandez*
Paul J. Kennedy
Jessica M. Hernandez
KENNEDY HERNANDEZ & HARRISON, PC
201 12th St. NW
Albuquerque, NM 87102-1815
(505) 842-8662
pkennedy@kennedyhernandez.com
jhernandez@kennedyhernandez.com

Gregory P. Hansel, pro hac vice to be filed
Michael S. Smith, pro hac vice to be filed
PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP
One City Center
Portland, ME 04101
(207) 791-3000
ghansel@preti.com
msmith@preti.com

Joseph C. Kohn, pro hac vice to be filed
KOHN SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
jkohn@kohnswift.com

Stewart H. Lapayowker, pro hac vice to be filed
LAPAYOWKER JET COUNSEL, P.A.
Attorneys at Law
501 E. Las Olas Blvd., Suite 300
Fort Lauderdale, FL 33301
(954) 202-9600
Stewart@JetCounsel.Law

*Attorneys for Plaintiff TBC Services, LLC and the Proposed Class*